## WESTERN PAC. R. CORPORATION v. WESTERN PAC. R. CO. et al.

### No. 26508.

United States District Court,
N. D. California, S. D.

Sept. 6, 1949.

Herman Phleger, Maurice E. Harrison, Moses Lasky, Brobeck, Phleger & Harrison, San Francisco, California, Frank C. Nicodemus, Jr., New York City, A. Perry Osborn, New York City, Norris Darrell, New York City, Mahlon Dickerson, New York City, Leroy R. Goodrich, Oakland, California, for plaintiff.

Rogers & Clark, Webster V. Clark, San Francisco, California, David Freidenrich, San Francisco, California, Julius Levy, New York City, for Russell M. Van Kirk, Henry Offerman and J. S. Farlee & Co., Inc., a corporation, plaintiffs in intervention, Pomerantz, Levy, Schreiber & Haudek, Abraham L. Pomerantz, New York City, of counsel.

Allan P. Matthew, James D. Adams, Robert L. Lipman, Burnham Enersen, Walker Lowry, McCutchen, Thomas, Matthew, Griffiths & Greene, San Francisco, California, for Western Pac. R. Co. et al., defendants.

Everett A. Mathews, Pillsbury, Madison & Sutro, San Francisco, Calif., A. Donald MacKinnon, Milbank, Tweed, Hope & Hadley, New York City, Forbes D. Shaw, Whitman, Ransom, Coulson & Goetz, New York City, for Western Realty Co., defendant.

GOODMAN, District Judge.

Plaintiff, a former holding company, whose interest in its subsidiary had been finally declared valueless in the subsidiary's reorganization proceeding under § 77 of the Bankruptcy Act, 11 U.S.C.A. § 205, has tendered the novel claim that it should be awarded, in equity, a part, if not all, of the subsidiary's income tax saving while in reorganization, resulting from the filing of consolidated corporate income tax returns.

A somewhat detailed history must be set down in order to properly appraise the unique demand of plaintiff.

Plaintiff is The Western Pacific Railroad Corporation; its subsidiary was Western Pacific Railroad Company, an operating railroad company, herein referred to as the "debtor;" defendant, the reorganized subsidiary, is The Western Pacific Railroad Company.

### Statement of Facts.

Plaintiff corporation, a so-called holding company, from 1916 to April 30, 1944, owned all the outstanding capital stock of the debtor. For some years prior to 1935, the financial condition of the debtor had been steadily worsening. In 1935 it filed a petition under Section 77 of the Bankruptcy Act, 11 U.S.C.A. § 205, and this Court in that year placed its affairs in the hands of trustees. Thereafter a plan of reorganization was proposed and in 1939 it was approved by the Interstate Commerce Commission. 233 I.C.C. 409. Inter alia, it was determined in the plan that the capital stock of the debtor owned by the plaintiff was without equity or value and that plaintiff and its stockholders therefore were not entitled to participate in the plan. In 1940 this Court approved the plan of reorganization, including approval of the findings of the Interstate Commerce Commission as to the worthlessness of the plaintiff's equity. The Circuit Court of Appeals (now Court of Appeals) of the Ninth Circuit reversed in 1941, 124 F.2d 136. In 1943 the Supreme Court reversed the Cir-

cuit Court and affirmed the order of the District Court. Ecker v. Western Pac. R. R. Corp., 318 U.S. 448, 63 S.Ct. 692, 87 L.Ed. 892. It there considered and rejected the contention of the plaintiff that it should have the right to participate in the plan because of recent increased earnings of the debtor. 318 U.S. at pages 508, 509, 63 S.Ct. at pages 723, 724.[1] Thereafter, the plan of reorganization was, in accordance with the statutory provisions, 11 U.S. C.A. § 205 (e) submitted to the creditors, and, after their approval, the plan was confirmed on October 11, 1943 by this Court. The reorganization committee designated in the plan of reorganization, instead of forming a new corporation, determined to use the corporate structure or shell of the old company (debtor) and to execute the plan of reorganization by revesting its former properties in the reorganized company, i. e. the defendant. On November 22, 1943, an agreement was made between the plaintiff, its secured creditors and the reorganization committee wherein a modus of revesting was set up. Among other things, the plaintiff agreed therein to transfer all of its stock in the debtor to the reorganization committee. This agreement was approved by this Court, in December 1943. The transfer of the stock was not actually made until April 1944 because of an unsuccessful litigative[2] attempt to prevent the same. During the period of years in which the plaintiff was the owner of all the outstanding stock of the debtor, plaintiff had followed the practice of filing consolidated or affiliated income tax returns, in which it had reported the earnings of the debtor as well as other affiliated companies, which the plaintiff wholly or partly owned. The amount of taxes paid by the plaintiff pursuant to such returns was allocated among the various subsidiary companies having taxable income in proportion to the amount of such taxable income. The practice of filing the consolidated returns continued throughout the reorganization period. The returns, during the reorganization period, were prepared by the employees of the debtor and signed by the president of the plaintiff corporation, although they were never submitted to its board of directors for approval or consideration.

During the year 1942, the debtor made substantial net earnings. Neither plaintiff, nor any of its other subsidiary companies, had any earnings during 1942. A consolidated return was filed for the year 1942 in which the tax liability, due to the earnings of the debtor, was $4,144,828. Later in 1943, after the filing of the 1942 return and payment of the tax, the tax attorneys for defendant "discovered" Section 123 of the Revenue Act of 1942. 26 U.S.C.A. § 23(g) (4).[3] They proposed what they denoted a "paradoxical" theory, by which the worthlessness of the plaintiff's stock (which had cost the plaintiff some $75,000,000) in the operating railroad company (debtor) might be availed of as an offset to the operating income of the debtor and thus result in a net loss and no tax obligation. Further, their theory was that part of this $75,000,000 loss in 1943, could be "carried back" to 1942, § 122(b) (1) of the Internal Revenue Code, 26 U.S.C.A. § 122(b) (1), and part could be "carried over" to 1944. Section 122 (b) (2) of the Internal Revenue Code, 26 U.S.C.A. § 122(b) (2). Thereupon a claim for refund of the amount of tax paid for 1942 was filed in the name of the plaintiff. Operations of the debtor during 1943 and up to April 30, 1944 were increasingly profitable and, except for the offset of the capital stock loss of the plaintiff itself, would have called for the payment of some $17,000,000 in income taxes. So the tax attorneys caused the filing of consolidated tax returns for 1943 and for the forepart

1. See In re Denver & R. G. W. R. Co., 10 Cir., 150 F.2d 28 and Reconstruction Finance Corp. v. Denver & R. G. R. Co., 328 U.S. 495, 66 S.Ct. 1282, 90 L.Ed. 1400, where similar holdings upon similar contentions were made.

2. Bryan v. Western Pac. R. Corp., Del. Ch. 1944, 35 A.2d 909.

3. "Stock in affiliated corporation. For the purposes of paragraph (2) stock in a corporation affiliated with the taxpayer shall not be deemed a capital asset." Subsection 4 of § 23(g). By this subsection, losses resulting from worthlessness of stock of an affiliate became operating losses instead of capital losses as theretofore.

of 1944 in the name of plaintiff, in which sufficient portions of the $75,000,000 stock loss were used as offsets against the operating accounts for these years, so as to show no net income. The validity of the offsets was questioned by the Commissioner of Internal Revenue and conferences were had between the tax counsel for the defendant and the Commissioner. As a result, a tax settlement was made with the Commissioner whereby, in consideration of the withdrawal of the claim for refund, the Commissioner accepted and approved the returns. The nature and basis of this compromise settlement will be hereafter more fully discussed.

Subsequent to the filing of the claim for refund of the 1942 tax paid, and the filing of the consolidated tax returns for 1943 and part of 1944, and after negotiations for the settlement of the entire tax issue with the Commissioner of Internal Revenue had started, the plaintiff, on October 10, 1946 filed its bill of complaint in equity herein. In substance the bill of complaint recited the filing of the claim for refund, the commencement of the negotiations for the approval of the consolidated returns and prayed that the Court settle the proprietary rights of the plaintiff and the defendant in the tax saving involved. It was further prayed that funds equivalent to the tax savings be placed in the custody of the court for proper and equitable distribution.[4]

On April 7, 1947, the Court permitted the filing of a complaint in intervention on behalf of certain stockholders of the plaintiff who wished to join in the demand of the plaintiff and in its prayer for relief against the defendant. The settlement and agreement with the Commissioner, by which the claim for refund was withdrawn and the consolidated returns for the years 1942, 1943 and part of 1944 were accepted and approved, was consummated on August 14, 1947.

On December 17, 1947, plaintiff filed a supplementary bill of complaint, wherein the consummation of the settlement and compromise was set forth. It was there further alleged that the defendant through its officers and attorneys had controlled the board of directors of the plaintiff corporation and that by reason of such control plaintiff was caused to file the consolidated returns for the benefit of the defendant. Throughout the proceedings and in the trial, this has been referred to as "duality of control."

In the supplementary complaint, the plaintiff prayed that the Court, in equity, enter a decree allocating and directing the payment of the abated taxes, amounting to some $17,000,000, to the plaintiff by way of mitigation of its losses in its subsidiary.

After many preliminary motions were made and disposed of, and after the filing of answers by the defendants and after pre-trial conference, the cause finally came on for trial.

The trial itself consumed 13 days; the proceedings are set forth in 1,700 pages of transcript; 14 witnesses testified and 164 exhibits, with various subdivisions, were introduced in evidence.

A number of special defenses were pleaded and testimony and exhibits offered at the trial in support thereof.

But I am of the opinion, in view of the fact that the cause is concededly of equitable cognizance, that decision must depend upon the essential righteousness of plaintiff's claim as an equitable demand.

### Discussion.

The income tax picture presented is bizarre indeed. It is "paradoxical" as the defendant's tax attorneys put it.[5] The

---

4. The debtor had on two separate occasions set aside reserve funds for the payment of the taxes, to protect against the contingency of adverse ruling by Commissioner or Court.

5. In a letter dated May 20, 1943 (plff. Ex. 50) addressed to Curry, Vice President of defendant company, tax counsel Polk set forth his idea of using the plain-

tiff's stock loss in the debtor to offset debtor's profits, saying: "This is commented upon rather than suggested, since it is *paradoxical to compute a loss upon the operating company's stock which, through the mechanics of consolidated return reporting, could be used to nullify the very income of the affiliate whose stock had become worthless.*" (Italics supplied.)

Western Pacific Railroad Company, the operating company, profitably conducted its railroad facilities in reorganization during 1942, 1943 and the forepart of 1944. Its own profit and loss records showed the debtor to be accountable to the United States in the sum of $21,346,567 income taxes for the years 1942, 1943 and the first four months of 1944. During this same period of time the plaintiff was still the legal owner of all the capital stock of the debtor, an ownership which had been declared by both the Interstate Commerce Commission and the Reorganization Court to be valueless. But the tax attorneys for the defendant conceived a "paradoxical" plan. They decided that they would file, pursuant to Section 141 of the Internal Revenue Code, 26 U.S.C.A. § 141, and the Treasury Regulations issued thereunder[6] affiliated or consolidated returns on behalf of the parent company and its subsidiaries and in them set up the plaintiff's stock loss (i. e., its ownership in the debtor) as an income tax deduction against the operating profits. Ostensibly they found their authority for so doing in Section 123 of the Revenue Act of 1942. 26 U.S.C.A. § 23 (g) (4).[7] Thus, part of the lost $75,000,000 stockholding of the plaintiff in the debtor was applied as an offset to operating profits during each of the three years in question to the end that no part of the $21,346,-567 tax would be paid.

This was more than mere tax "saving;" it amounted to a complete tax "escape." But the debtor had already paid $4,144,-828 income taxes for the fiscal year 1942 and it had filed a claim for refund of such taxes upon the ground that it owed no taxes for 1942 if, on the theory of "carry-back", part of the $75,000,000 stock loss was a proper deduction. So in order to make the far larger saving or "escape"

offered for the three years in question, the claim for refund was waived and the Commissioner then accepted the returns for 1942, 1943 and the fore part of 1944. The effect of this was that the debtor paid $4,-144,828 taxes to the United States in order to escape the $21,346,567 previously mentioned, or a net saving or "escape" of $17,201,739. To all of this the Commissioner agreed. It was stated to be a compromise because of some question as to the date of definite ascertainment of the stock loss. The Commissioner apparently agreed that, under the 1942 amendment, § 23(g) (4), it was proper to offset the capital stock loss against the net operating gain, and the taxpayer paid $4,144,828 to resolve some alleged uncertainty as to the date of ascertainment of the stock loss.[8]

How the amendment to the statute, § 23(g) (4), could have been availed of by the debtor is, mildly stated, puzzling, if not downright amazing. Its application in an orthodox case is understandable. The theory of deducting a loss in an economic aggregation of affiliated corporations, where one unit gains and the other unit loses, has been recognized and approved by Congress and the Courts.

Prior to the Revenue Act of 1938, losses resulting from the worthlessness of stocks and bonds were deductible from ordinary income and were not subject to the so-called capital-loss limitations. These limitations, that is that a capital loss could only offset a capital gain, had applied only to sales and exchanges, with the result that it was more advantageous to allow stocks, that might become worthless, to become worthless rather than to sell them. By the 1938 Act losses sustained by reason of the worthlessness of securities were treated as if they resulted from the sale or exchange of capital assets and thus were subject to the limitations applying to de-

---

6. Section 141, Internal Rev.Code permits the filing of a consolidated return by affiliated corporations. Regulations 104 and 110 contain detailed requirements for such filing.

7. See footnote No. 3.

8. It is not at all clear to the Court how the alleged uncertainty as to the date of ascertainment of the stock loss, could have been a true factor affecting the tax settlement, inasmuch as any such uncertainty would, if it existed, as well apply with respect to the 1943 and 1944 returns.

ductions in the form of capital losses. 26 U.S.C.A. § 23(g) (4), which was Section 123 of the Revenue Act of 1942, accorded losses on worthless stocks held by a taxpayer in affiliated corporations the same treatment accorded losses from all worthless securities prior to the Revenue Act of 1938.

Research does not disclose any statement of Congressional reason or purpose for the enactment of Section 123 of the Revenue Act of 1942, 26 U.S.C.A. § 23(g) (4). It was not in the original House Bill (H.R. 7378), but was an amendment added in the Senate (S.Rept. 1631, p. 89, 77th Cong. 2nd Sess.) Neither the Senate Report, nor the Conference Report of the Bill, H.Rept. 2586 (Cong. Rec. 77th Cong. 2nd Sess. p. 8401, 8441) state the reasons for the amendment. It is of interest that in the Revenue Act of 1942, 26 U.S.C.A. § 117(i), securities held by banks were accorded the same benefits as Section 123 accorded to affiliated corporations. While the purpose and intent of Congress has not anywhere been precisely stated, it is a fair and justifiable inference that the intent was to enlarge the general benefits afforded by consolidated or affiliated corporate returns.

It may be briefly stated that the philosophy of the consolidated return is to disregard the corporate entity and to tax as a single business or economic unit, what really is a business unit. This has been found to be sound, equitable and convenient tax procedure. It treats an affiliate group of corporations as one business enterprise, the various affiliates being considered as if they were branch offices of the main business establishment. The income from all units is considered as a single income, and the losses from all units, are treated as a single loss. See the following in this connection: Mertens, Law of Federal Income Taxation, (1942) Vol. 8, § 46.01 and § 46.02: Montgomery's Federal Taxes—Corporations and Partnerships 1948-1949, Vol. II, p. 678; Miller, "The Taxation of

Intercompany Income," Law and Contemporary Problems, 1940, Vol. 7, 301, 306; Commerce Clearing House Standard Federal Tax Reporter, 1949, Vol. 1, paragraph 200Cl. See also statement of the Acting Secretary of the Treasury, regarding the preliminary report of the Special Committee of the Committee on Ways and Means, 1933, p. 13.

In my opinion, it is crystal clear that in enacting Section 23(g)(4), the Congress was merely furthering the general purposes and benefits of the statutory provisions allowing the filing of affiliated corporation returns. Obviously it intended by the provision, 23(g) (4), to allow a parent company in an affiliated group, if its ownership of stock in a subsidiary becomes worthless, to offset it against other income of the parent company in any other subsidiaries or subsidiary, in the same manner, as it had been permitted to offset operating losses in one subsidiary as against operating gains in another. To assume however that the Congress intended by 23 (g) (4) to statutorily authorize what was done in this case, is to attribute plain stupidity to the Congress of the United States—an unthinkable procedure, despite the general habit of criticism, both fair and unfair.

But here the inexplicable occurred. For $4,144,828, the United States released $21,346,567 in taxes upon a basis which is completely incomprehensible. The tax "escape" invites a type of scrutiny which this Court is powerless to give it.

█ Obviously the Court cannot pass judgment upon the validity of the tax compromise and settlement. It is now closed. It is final and cannot be reopened except for fraud.

█ I am not unmindful of the recognized and approved philosophy that a taxpayer may avail himself of every proper means of reducing his taxes.[9] In every

9. U. S. v. Isham, 17 Wall. 496, 84 U.S. 496, 506, 21 L.Ed. 728; Jones v. Helvering, 63 App.D.C. 204, 71 F.2d 214, 217; Iowa Bridge Co. v. Commissioner, 8 Cir., 39 F.2d 777, 781; Commissioner v. Eldridge, 9 Cir., 79 F.2d 629, 631, 102 A.L.R. 500; Mertens, Law of Fed. Taxation (1948) Vol. 10A, § 61.06 at 249; Paul, Studies in Federal Taxation (1937) p. 104.

sense of the word, however, there was a real escape from the payment of taxes here. If I had the power, I would not hesitate to set aside the tax settlement. Indeed, if I could, I would order these taxes paid to the United States. That would effectively dispose of the cause.

Perhaps it may be said that it is impertinent for the Court to concern itself with a closed tax transaction and agreement such as this. But if equity principles are our guide, then this tax settlement is of the web and woof of the issue to be decided. Equity has no precise boundaries and certainly not in this unique controversy.

If this were an ordinary and more common type of tax saving, there might be impertinence to the Court's concern with it. But this so-called "saving" is inextricably entwined with the equities. Its very nature shapes and molds these equities. It is a "'pot of honey' equally attractive to principals and advocates."[10] When equity is invoked to divide or distribute the "pot," it cannot be blindfolded as to the origin or nature of the "honey."

It is argued, in effect, by plaintiff that, irrespective of whether or not the tax settlement was in accord with the statute, nevertheless it is a completed transaction and a closed book and should have no place in the determination of the validity of plaintiff's cause of action. It is asserted that tax savings having been made, the only question remaining is whether or not on the record here, the defendant must turn over to plaintiff an amount equal to all, or a substantial part of, the tax savings. But in my opinion, the tax escape was erroneous and unjust. It cannot be cured by committing the further inequity of distributing the gain thus made to others.

Debtor, having made good its "escape," now comes plaintiff and prays for a share, ir not all, of that which "escaped." Whether there was, or was not, "duality of control" respecting the directorates of the two companies, appears to me to be not too important. True, there is a preponderance of

the evidence in favor of the plaintiff's contention of "duality of control." Be that as it may, I am compelled to rest decision upon the fundamental issue of the justice and equity of plaintiff's right, if any, to be paid for that which was escaped. Analytically speaking, what the plaintiff seeks is to collect from the defendant an amount equal to all, or a substantial part of, taxes that the debtor did not pay to the United States.

What is the true nature of the claim of plaintiff and of the relief it seeks? What plaintiff really seeks is not all or a share of the so-called tax savings. Rather it is a circuitous way of obtaining something in the nature of equity or value for its ownership, rejected in the reorganization plan. Or put differently, it is an effort to share in the earnings of the debtor during the reorganization period. Essentially a so-called tax saving is but a different name for an earning. Assuming, arguendo, the validity of plaintiff's contention, its right or claim is dependent upon the debtor making earnings. If there were no earnings there could be no so-called tax saving. A "saving" in taxes is a negative concept. It is a benefit to one obligated to pay money, resulting from not having to pay. No benefit could inure from participating in non-payment of an obligation, unless there rested upon the participant an obligation to pay. Absent such obligation, any sharing of that which is not paid out, would be gratuitous. In effect therefore, recognition of plaintiff's claim would be recognition of a right in plaintiff to share in debtor's earnings. As already stated, a demand substantially seeking this end was heretofore asserted by way of opposition to the plan and rejected. Ecker v. Western Pac. R. R. Corp., 318 U.S. 448, 63 S.Ct. 692, 87 L.Ed. 892.

Not only that, but the philosophy underlying Section 77 of the Bankruptcy Act stands as a barrier against the equitable validity of plaintiff's claim in this cause. Rehabilitation of a debtor by readjusting its financial structure in the interest of the debtor, its creditors and the public, in a fair and equitable plan of reorganization,

10. Breving v. The Lloyd Cuarto, D.C., 84 F.Supp. 33, 35.

is the essential purpose of Section 77. If a debtor in fact has an equity, it is and should be recognized. If not, it is disregarded. Above all, Section 77 was devised to provide in the public interest both a speedy and efficient means of resuscitating, among others, sick and ailing railroads.

See Van Schaick v. McCarthy, 10 Cir., 116 F.2d 987, 992; New England Coal & Coke Co. v. Rutland R. Co., 2 Cir., 143 F. 2d 179, 184; In re Denver & R. G. W. R. Co., 10 Cir., 150 F.2d 28, 34; Thompson v. State of Louisiana, 8 Cir., 98 F.2d 108, 110; Craven, "The Judicial and Administrative Mechanism of Section 77," 1940, 7 Law and Contemporary Problems 464.

When it was finally determined, after running the full gamut of court and administrative procedure, in the reorganization of the Western Pacific Railroad Company, that the plaintiff's interest was worthless, nothing short of some extraordinary cause justifying reopening the reorganization proceeding could effect a change. To make any award in this cause, under the assumed authority of equity principles, would be in effect to modify the administrative and judicial judgments in the reorganization proceeding. Such a procedure would be an indirect nullification of the purpose of the reorganization statute, in the guise of an afterthought allegedly of equitable persuasion.

What was the actual result of the tax saving agreement by which it was determined that some $21,000,000 in taxes were not due to the United States? Simply that the debtor did not pay taxes. It does not follow at all from this, that an obligation to pay the unpaid tax money, one to another, was thereby created.

The so-called "duality of control," much discussed and emphasized, is not important in resolving the tendered issue. For in the final analysis, plaintiff's hope to succeed here depends upon whether it could have lawfully acquired these unpaid tax monies by voluntary agreement between the directorates of the two companies. In my opinion, it could not. For such a procedure would violate and nullify the reorganization plan and the decree of the Court confirming it. It would permit the plaintiff to share in the earnings of the debtor during the period of reorganization. Equity would aid the creditors of debtor to prevent it. Indeed there is some merit to defendant's contention that a firm obligation rested upon plaintiff to conform and cooperate to the end that the creditors and new owners should be benefited to the fullest.

What would be the result if the contention of plaintiff, that law and equity imposes an obligation upon defendant to pay the whole amount of unpaid tax money over to plaintiff, were sustained? It would mean a court order directing defendant to pay over to plaintiff an amount equal to the taxes the debtor *should have paid* to the United States. So the plaintiff, which formerly owned and was a failure in operating the debtor, would get from the defendant a sum of money out of debtor's earnings during reorganization equal to the taxes the debtor should have paid to the United States resulting from its profitable operations. In my opinion, such a whirligig rationale transcends all reasonable concepts of equity and justice.

An array of able counsel on both sides have put forth prodigious and ingenious efforts,[11] one side to retain the benefits of the tax "escape," and the other to obtain them. And all the time the taxes escaped in reality belong to the United States!

The Court cannot cause these taxes to be paid, where they should be paid, to the United States. But, as between the parties, no persuasion of conscience or equity impels me to do otherwise than to leave the parties where they are, the defendant with its amazing and undeserved tax success; the plaintiff, as the reorgani-

---

11. In the preparation for the trial, and to develop the historical facts concerning the controversy and upon the subject of the so-called "duality of control," the depositions of 13 witnesses were taken over a period of many months and cover 6190 pages of transcript. Briefs, on submission of the cause, total 485 printed pages.

zation decree left it, without interest in the debtor.

For the reasons stated, judgment will go for the defendant.[12]

12. Inasmuch as there is little factual dispute pertinent to the issue decided, this opinion may well serve, under the rules, so far as necessary, as findings of fact and conclusions of law. But counsel, if they wish, may submit findings pursuant to the Rules, provided they are limited to the issues involving the essential equitable considerations upon which the decision rests.