**UNITED STATES ex rel. ROBERTS et al.**
**v. WESTERN PAC. R. CO. et al.**

No. 12723.

United States Court of Appeals
Ninth Circuit.

June 15, 1951.

Rehearing Denied July 23, 1951.

S. Roberts, in propria persona.

C. W. Dooling, San Francisco, Cal. (A. B. Dunne, Dunne, Dunne & Phelps, of counsel), San Francisco, Cal., for appellee.

Before STEPHENS, BONE and POPE, Circuit Judges.

POPE, Circuit Judge.

This was an action brought by the appellant Roberts against the respondent Railroad Company, under those provisions of R.S. 3490, 3491, 3492, 5438, 57 Stat. 608, 31 U.S.C.A. §§ 231–233, 235, which authorizes the bringing of qui tam actions. Appellant sought to recover, on behalf of the United States, income and excess profits taxes of which, it was alleged, the United States was defrauded through the filing of false and fraudulent tax returns.

Generally speaking the circumstances constituting the alleged fraud, are those set out in the opinion of the District Court in Western Pacific Railroad Corporation v. Western Pacific Railroad Company, 85 F.Supp. 868, which opinion is sought to be incorporated, by reference, in the complaint here. Thus, in the first of the three alleged causes of action, it is stated that in 1943, the defendant Railroad Company had a net taxable income in excess of 18 million dollars, on account of which it owed income and excess profits taxes of over 12 million dollars; that for the purpose of cheating and defrauding the Government, it caused false, fictitious and fraudulent consolidated income and excess profits tax returns to be made and filed in the name of, and purportedly by, the Western Pacific Railroad *Corporation,* upon the false claim that the latter corporation owned 95 per cent of the defendant Railroad Company's stock. It was alleged that through this expedient the consolidated return was made to disclose a 75 million dollar loss, which more than wiped out the Railroad Company's 18 million dollar profit. This loss arose out of certain pending proceedings for reorganization of the Railway Company under § 77 of the Bankruptcy Act, 11 U.S.C.A. § 205, in which a plan of reorganization, approved by the Interstate Commerce Commission in 1939, determined that the Company's capital stock, substantially all of which was held by the above-mentioned Railroad Corporation, was without value, and that therefore the Corporation was not entitled to participate in the plan.[1] Relying upon § 123 of the Revenue Act of 1942, 26 U.S.C.A. § 23(g) (4),[2] the return showed the loss of the corporation's stock in the company, for which it had paid 75 million dollars, as an operating loss. Thus the consolidated return showed a large net loss.

The device of thus filing a consolidated return, using the stock loss as an offset to earnings of the defendant Railroad Company, was first used in the 1943 return. In 1942, the Company had also made substantial earnings, and for that year made return for itself and its own subsidiaries, and paid in excess of 4 million dollars pursuant

1. The plan was approved by the District Court in 1940, this court reversed in 1941, In re Western Pac. R. Co., 9 Cir., 124 F.2d 136, but was itself reversed in 1943 in Ecker v. Western Pac. R. R. Corp., 318 U.S. 448, 63 S.Ct. 692, 87 L.Ed. 892, which affirmed the District Court's order.

2. As explained in footnote 3 of the opinion in Western Railroad Corporation v. Western Pacific Railroad Company, supra, 85 F.Supp. 868, at p. 870, "By this subsection, losses resulting from worthlessness of stock of an affiliate became operating losses instead of capital losses as theretofore."

to this return. In the third alleged cause of action, it is set forth that on March 9, 1945, the Railroad Company filed a claim for refund of this 1942 tax, based on a carry-back of the 1943 net loss.

The second alleged cause of action relates to asserted false and fraudulent returns for the year 1944 in which, it is alleged, the defendant Company managed to show no taxable income by carrying forward an additional portion of the claimed 1943 loss.

It appears from the complaint that following the filing of the claim for refund of the 1942 taxes, negotiations ensued between the taxpayer and the Government which eventuated in a settlement whereby the claim for refund was withdrawn and the consolidated returns for 1943 and 1944 were allowed to stand.

The complaint, not a model of pleading, in that it intermingles allegations of fact with many mere conclusions, appears to disclose as the principal representations claimed to have been made in connection with the filing of the returns, the following:

(a) That it was falsely claimed that the stock loss occurred in 1943, whereas it was a 1939 loss.

(b) That it was falsely represented that the Corporation (the Holding Company) made the return, whereas it had no part in it, in that the whole device was that of the defendant Company, which intended to obtain the exclusive benefit thereof.

(c) That it was falsely represented that the relationship between the two corporations was such that a consolidated return was permissible, whereas in truth and in fact the Railroad Corporation was not the owner of 95 per cent of the capital stock of the Railroad Company, but the two corporations were, after 1939, complete strangers to each other, as ownership of defendant Railroad Company was then in the Bankruptcy Trustees.

The trial court sustained defendant's motion to dismiss. Its order stated that it was the opinion of the court "that the complaint alleges sufficient facts from which it can be held that defendant * * * had made certain false or fraudulent claims against the Government * * * upon which liability might be found under the provisions of 31 U.S.C.A. § 231. However, it also appears from the complaint that this suit is based upon evidence and information in the possession of the United States and of agencies, officers and employees thereof at the time this suit was brought, and that all matters of fact alleged in the complaint as amended were matters of public record. For this reason this Court is without jurisdiction to proceed with the action and the motion to dismiss is hereby granted"

This determination that the court was without jurisdiction was based upon the provision of § 232 of Title 31, that "The court shall have no jurisdiction to proceed with any such suit brought under clause (B) or pending suit brought under this section whenever it shall be made to appear that such suit was based upon evidence or information in the possession of the United States, or any agency, officer or employee thereof, at the time such suit was brought."[3]

The court having thus found itself to be without jurisdiction to proceed, entered judgment dismissing the complaint. This appeal followed.

Appellant asserts that the court's determination that the suit is based upon evidence and information in the possession of the United States, its agencies, officers and employees, could not be derived from any allegation of the complaint other than the one disclosing the fact that the case of Western Pacific Railroad Corporation v. Western Pacific Railroad Company, supra, had been tried before Judge Goodman, whose opinion is cited above. Appellant argues that a Federal Judge, particularly when sitting, as in this instance, in a case arising solely out of diversity jurisdiction, is not one of the agencies, officers or employees referred to in the portion of the statute upon which the court acted. This, it

---

3. This language of the Act, added in 1943, would appear to be the result of the dissent of Mr. Justice Jackson in

U. S. ex rel. Marcus v. Hess, 317 U.S. 537, 556, 63 S.Ct. 379, 87 L.Ed. 443.

is said, must be true since the Judge is not an officer charged with doing anything about such information coming to him in a suit involving other issues. Appellant also argues that in no event may possession of such information by the United States oust the court of jurisdiction of the qui tam action unless the United States has proceeded to take some effective action based on the information.

Appellee asserts that the record sufficiently shows the possession of such information by the Bureau of Internal Revenue itself. It says this conclusion must be reached when the complaint is read in the light of the presumption that officers properly carry out the duties imposed upon them by law. Hence, appellee says, it is to be presumed, unless expressly negatived by the complaint, that the Bureau had ascertained all the facts pertaining to appellee's liability for taxes.

The portion of the court's order which we have quoted above does not indicate just what "agencies, officers and employees", the court had in mind.[4] It may be assumed the reference is solely to what transpired in the case tried before Judge Goodman.

We find it unnecessary to pass upon these conflicting views, for we have concluded that the statutes do not permit the maintenance of a qui tam action for the recovery of taxes due the United States under the circumstances here presented.

The controlling provisions are to be found in R.S. §§ 3490, 3491 and 5438. § 3490 provided that "Any person * * * who shall do or commit any of the acts prohibited by * * * section fifty-four hundred and thirty-eight, Title 'Crimes,' shall forfeit and pay to the United States the sum of two thousand dollars, and, in addition, double the amount of damages which the United States may have sustained * * *." This section has never been amended. Section 3491, in its original form, and as later amended,[5] specified the venue for actions to recover such damages and permitted such actions to "be brought and carried on by any person, as well for himself as for the United States * *." Thus, it will be seen, the acts for which recovery may be had under §§ 3490 and 3491, are defined in § 5438.[6] This section, in itself, solely a criminal provision, is set forth in the margin.[7]

4. Implicit in the court's opinion that the complaint sufficiently alleges false claims "upon which liability might be found", is a finding that the tax officials were deceived because ignorant of the facts misrepresented. Nothing in the complaint would show that the deceived tax officials discovered the facts before the commencement of the instant action. The complaint, however, does disclose that Judge Goodman became aware of the facts.

5. It was amended in 1936, 49 Stat. 1921, and in 1943, 57 Stat. 608. The latter included the change referred to in footnote 3, supra.

6. This section was superseded by § 35 of the Penal Code of 1910. See explanatory note to that section.

7. Title LXX, Crimes, Ch. 5, § 5438, Mar. 2, 1863, c. 67, §§ 1, 3, 12 Stat. pp. 696, 698. "Every person who makes or causes to be made, or presents or causes to be presented, for payment or approval, to or by any person or officer in the civil, military, or naval service of the United States, any claim upon or against the Government of the United

States, or any department or officer thereof, knowing such claim to be false, fictitious, or fraudulent, or who, for the purpose of obtaining or aiding to obtain the payment or approval of such claim, makes, uses, or causes to be made or used, any false bill, receipt, voucher, roll, account, claim, certificate, affidavit or deposition, knowing the same to contain any fraudulent or fictitious statement or entry, or who enters into any agreement, combination, or conspiracy to defraud the Government of the United States, or any department or officer thereof, by obtaining or aiding to obtain the payment or allowance of any false or fraudulent claim, or who, having charge, possession, custody, or control of any money or other public property used or to be used in the military or naval service, who, with intent to defraud the United States or willfully to conceal such money or other property, delivers or causes to be delivered, to any other person having authority to receive the same, any amount of such money or other property less than that for which he received a certificate or took a receipt, and every person au-

It is noted that the key language is: "Every person who makes * * * any claim upon or against the Government * * * knowing such claim to be false, fictitious, or fraudulent," etc. Speaking of this phraseology as incorporated in § 35 of the Penal Code of 1910, the Supreme Court said, in United States v. Cohn, 270 U.S. 339 at page 345, 46 S.Ct. 251, 253, 70 L.Ed. 616: "the provision relating to the payment or approval of a 'claim upon or against' the Government relates solely to the payment or approval of a claim for money or property to which a right is asserted against the Government, based upon the Government's own liability to the claimant." We find in § 5438 no language appropriate to describe a false tax return or a fraudulent evasion of a tax liability. It is true that the complaint discloses that the Railroad Company, after first paying its 1942 taxes, filed a claim for refund, based upon the same facts which were set forth in the returns for 1943 and 1944. This claim was withdrawn, but the withdrawal was the consideration for the Government's agreement to let the 1943 and 1944 returns stand.[8] While such claim for refund might, of course, constitute a "claim upon or against the Government", to treat it as such within the meaning of the statutes here involved would produce the rather anomalous result that while no qui tam action could be brought under these sections to recover the amount of taxes fraudulently withheld, yet such a claimant could prevail where the defendant had first paid the taxes and then procured a fraudulent refund, even although the fraud against the revenue was the same in each case.

That no such incongruous consequences were intended by Congress, and that in respect to tax frauds the legislative purpose was not to permit an action of the kind here involved, under the circumstances here present, to be maintained by an individual, at least without express consent of the Commissioner of Internal Revenue, is apparent from the provisions of the Internal Revenue Code, § 3740, 26 U.S.C.A. § 3740, which reads as follows: "No suit for the recovery of taxes, or of any fine, penalty, or forfeiture, shall be commenced unless the Commissioner authorizes or sanctions the proceedings and the Attorney General directs that the suit be commenced." 53 Stat. 460.[9]

When to the fact that the language of § 3490 is generally inapt for application to tax frauds, as we have suggested above, there is added the explicit language just quoted, it seems apparent that this action may not be maintained. There is no showing of the required authorizations.

Our conclusion to this effect is supported by the authority of Olson v. Mellon, D.C. W.D.Pa., 4 F.Supp. 947, the opinion in which was adopted and affirmed in U. S. ex rel. Knight v. Mellon, 3 Cir., 71 F.2d 1021, certiorari denied 293 U.S. 615, 55 S.Ct. 147, 79 L.Ed. 704. In that case the argument had been made that the type of transactions to which R.S. § 3490 applied, had been enlarged by a later amendment of § 5438 as incorporated in § 35 of the 1910 Penal

thorized to make or deliver any certificate, voucher, receipt, or other paper certifying the receipt of arms, ammunition, provisions, clothing, or other property so used or to be used, who makes or delivers the same to any other person without a full knowledge of the truth of the facts stated therein, and with intent to defraud the United States, and every person who knowingly purchases or receives in pledge for any obligation or indebtedness from any soldier, officer, sailor, or other person called into or employed in the military or naval service any arms, equipments, ammunition, clothes, military stores, or other public property, such soldier, sailor, officer, or other person not having

the lawful right to pledge or sell the same, every person so offending in any of the matters set forth in this section shall be imprisoned at hard labor for not less than one nor more than five years, or fined not less than one thousand nor more than five thousand dollars."

8. As Judge Goodman put it, in his opinion: "For $4,144,828, the United States released $21,346,567 in taxes upon a basis which is completely incomprehensible." [85 F.Supp. 873.]

9. The portion of this section, to and including the word "proceedings", was a part of R.S. § 3214.

Code. The court pointed out why such was not the case. It noted that § 231 of Title 31 of the 1927 edition of U.S.C.A., and which was intended to be the United States Code statement of § 3490, was in error in its reference to "section 80 of Title 18", since the latter was not, as the "editorial comment" disclosed, identical with the original text of § 5438.[10]

As for R.S. § 3214, as now included in § 3740 of the Internal Revenue Code, supra, that court held, as do we, that its language expressly prohibits the commencement of an action such as this where it has not been authorized or sanctioned by the Commissioner and the Attorney General.[11] We perceive no reason why it should be held to mean anything other than what it says.

The judgment is affirmed.

10. A revised version of § 231 appears in the "Pocket Part" of Title 31, without clue as to the source of this text other than reference to R.S. §§ 3490 and 5438.

11. The history of the legislation relating to detection of frauds in respect to revenue due the Government indicates that a system of rewarding informers was considered the desirable means of procuring aid from private persons, and that the statutory scheme was that actions to redress such frauds were to be kept within the control of the Commissioner and the Attorney General. § 3792 of Title 26, now authorizes such rewards to informers. In the Act of 1866, 14 Stat. 111, which first contained the requirement of the Commissioner's authorization, later carried forward into R.S. § 3214, supra, there was a similar provision, § 179, 14 Stat. 145, authorizing rewards to informers. The present § 3792 of Title 26 probably grew out of the Act of March 2, 1867, 14 Stat. 473. When that Act, appropriating money for the reward of informers as to tax frauds, was under consideration by Congress, an amendment was added in the House authorizing qui tam actions by such informers, but the amendment was stricken by the Senate, where the opinion was expressed that such an authorization would lead to abuse which "should be guarded against". See references to H.R. 1161, in Cong.Globe, 39th Cong. 2d Sess. pp. 1545, 1918, 1919.