Mrs. Elsie **HAYNES**, Appellant,

v.

William D. **FELDER**, Jr., et al.,
Appellees.

No. 16044.

United States Court of Appeals
Fifth Circuit.

Jan. 9, 1957.

Rehearing Denied March 1, 1957.

W. L. Wray, Isabelle Albright, Dallas, Tex., for appellant.

Coke & Coke, Clinton Foshee, Dallas, Tex., for appellee First Nat. Bank in Dallas.

Stanley E. Neely of Locke, Locke & Purnell, J. J. Fagan, Asst. Dist. Atty., Dallas, Tex., for appellees William D. Felder, Jr. et al.

R. Matt Dawson, (of Dawson & Dawson) Corsicana, Tex., for appellee Jackson Davis.

Before HUTCHESON, Chief Judge, and RIVES and TUTTLE, Circuit Judges.

TUTTLE, Circuit Judge.

In this appeal from a summary judgment of the trial court in favor of the individual appellees and against appellant in an interpleader suit in which the plaintiff National Bank was a mere stakeholder, we are faced in limine with a jurisdictional question. This question, posed because of the citizenship of the claimants, though foreshadowed and at least partially answered in principle in three cases from this circuit, Dugas v. American Surety Co., 5 Cir., 82 F.2d 953; Maryland Casualty Co. v. Glassell-Taylor & Robinson, 5 Cir., 156 F.2d 519, 521; and United States v. Sentinel Fire Ins. Co., 5 Cir. (en banc), 178 F.2d 217, is one which we think has not, in its precise form, been expressly answered by any appellate court.

As appears from the interpleader petition filed by the First National Bank of Dallas, which for jurisdictional purposes is to be considered a citizen of Texas,[1] one Jackson Davis found a cache of money in the basement of William D. Felder, Jr., who had acquired the house, originally built by his father in 1909, upon the settlement of the father's estate. The house had never been occupied by anyone other than the Felders. William D. Felder, Jr. and his three sisters, being all of the descendants and next of kin of Felder senior, asserted a claim to $43,430 which had been taken from Davis and deposited in plaintiff bank by the sheriff of Dallas County. A Mrs. Elsie

1. 28 U.S.C.A. § 1348.

Haynes, individually and in her representative capacity as community survivor of her husband's estate, claimed the fund as having been taken from her deceased husband and hidden in the Felder basement by Davis. Suits were filed against the bank in the Texas state court by Davis and by Mrs. Haynes, and the Felders made written demand on the bank for the money. Thereupon the interpleader was filed, naming Davis, Mrs. Haynes, and the Felders, including the husbands of the three sisters. The trial court restrained further action in the state court. All of the defendants, except for one Felder sister and her husband who lived in Tennessee, were alleged to be citizens of Texas. Davis later abandoned his claim, leaving the real issue between Mrs. Haynes on the one hand and the four Felders on the other. The Felder claim was joint, since they all claimed as next of kin of their father and none of them claimed through any other source, although William was in possession of the residence where the money was found. The court, on motion for summary judgment, sustained the Felder claim, thus inferentially holding that no substantial issue of fact was raised in support of the Haynes claim. It also entered a permanent injunction against any further proceeding in the state court.[2]

■ On this appeal appellant questions the jurisdiction of the district court. It would, of course, be necessary for us to raise this question ourselves if it appeared in the record.[3]

In its simplest terms it is this: can a Texas plaintiff who is merely a stakeholder asserting no claim to the property[4] bring interpleader against two rival sets of claimants, consisting of a citizen of Texas on the one side, opposed by four *joint* claimants of whom three are citizens of Texas and one is a citizen of Tennessee.

While we are in no doubt that the wording of the statute itself, the trend of the cases and of legal articles and books, combine to teach that such a plaintiff can do so, we think that it is worthwhile to set out with some particularity and fullness our reasons for holding so.

■■ It is clear that such a proceeding could not be brought as a diversity action under 28 U.S.C.A. § 1332,[5] which provides in part:

"1332. Diversity of citizenship; amount in controversy.

(a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy * * * is between:

(1) Citizens of different States; * * *."

This is so similar to the language of the original diversity statute which Chief Justice Marshall construed in Strawbridge v. Curtiss, 3 Cranch 267, 7 U.S. 267, 2 L.Ed. 435, that it has consistently been held that this law requires that each party have such citizenship that he could sue in diversity every other actual or indispensable party properly aligned against him, City of Indianapolis v. Chase National Bank, 314 U.S. 63, 62 S.Ct. 15, 86 L.Ed. 47, and this requirement has been held applicable to nonstatutory interpleader, Security Trust

2. As authorized by 28 U.S.C.A. § 2361.

3. Mansfield, C. & L. M. Ry. Co. v. Swan, 111 U.S. 379, 384, 4 S.Ct. 510, 28 L.Ed. 462.

4. Appellant asserts that the bank was not an impartial stakeholder for the reason that: (1) "the money was then the subject of litigation in the 13th Judicial District Court of Navarro County Texas" and (2) "Wm. D. Felder, Sr. was a customer of said Bank and had some $8000.00 in a lock box in said bank, besides a checking account at the date of his death. The Bank had been called on through a suit by Appellant herein for an accounting of any money they held for her husband, Harry Vance Haynes in the year 1954, more than a year prior to the alleged finding of the money." This contention appears to be without any merit. The bank asserts no claim to the money, nor does it contest the amount.

5. Under which interpleader may be brought by virtue of Rule 22(1), Fed. Rules Civ.Proc., 28 U.S.C.A.

& Savings Bank of San Diego v. Walsh, 9 Cir., 91 F.2d 481; 3 Moore § 22.04[2] (1948 ed.); 2 Barron & Holtzoff § 552.

Here, with common citizenship between the bank and Haynes, entirely aside from the mixed citizenship of the Felder group and the original participation of Davis, also a Texan, such diversity as is required under § 1332 is lacking. Thus the only basis of federal jurisdiction here which is, or might be, claimed is the Interpleader Act, 28 U.S.C.A. § 1335. The pertinent language of this statute is:

"(a) The district courts shall have original jurisdiction of any civil action of interpleader or in the nature of interpleader * * * if

"(1) Two or more adverse claimants, of diverse citizenship as defined in section 1332 of this title, are claiming or may claim to be entitled to such money or property * * *."

This statute does not appear to require any diversity between the plaintiff and the defendant-claimants, and such an interpretation of the similarly conceived 1936 Interpleader Act was held to be both correct and constitutional in Treinies v. Sunshine Mining Co., 308 U.S. 66, 60 S.Ct. 44, 84 L.Ed. 85. However, as the Court there held, the Act is bottomed on the diversity jurisdiction of the United States courts, permitted by Art. III, § 2, cl. 1(7) of the Constitution,[6] and thus it was necessary for Congress to specify some alternative form of diversity on which jurisdiction in particular cases could be grounded. This it did in the present Act by requiring "claimants, of diverse citizenship."

The question therefore is whether the diversity here existing among the claimants is sufficient to support jurisdiction. It might first of all be noted that there is insufficient diversity among the claimants to permit a regular diversity suit between them for even after Davis, also a Texan, was dismissed as a party to the suit, the two remaining interests were represented by a Texan on one side and three Texans and a Tennessean on the other. It might further be noted that this case appears to present the absolute minimum degree of diversity that can arise, especially when one considers that the plaintiff also was a Texas citizen. It must therefore be asked first whether this minimal diversity meets the statutory requirement, and second whether the statute so interpreted would be constitutional.

In analyzing the cases and authorities that have dealt with aspects of this question it must be kept in mind that many that appear to be superficially similar or use language broad enough to include the present situation actually involve a distinguishable jurisdictional issue. Interpleader suits may be attempted under Rule 22(1) (normal diversity—§ 1332) or 22(2) (statutory interpleader—§ 1335), or both, by plaintiffs (or defendants) who are disinterested (strict interpleader) or interested (bill in the nature of interpleader), and whose citizenship is totally, partially, or not at all diverse from that of all or some of the claimants. Restricting the present consideration as required by the facts of this case to statutory interpleader brought by a disinterested plaintiff on whose citizenship no diversity jurisdiction could be grounded, and all the claimants are either joint or rival (thus omitting the unusual situation suggested by the dissent in United States v. Sentinel Fire Ins. Co. 5 Cir. (en banc), 178 F.2d 217, of interests that are neither joint nor rival), it still appears necessary to analyze at least four situations arising from the different forms or degrees of diversity among claimants in multiparty actions.

(1) "Complete diversity," where any claimant whose interests are adverse to those of another also has diverse citizenship from him (e. g. three rival groups of joint claimants, one group each consisting of citizens of state A, B, and C).

6. "The judicial Power shall extend * * * to Controversies * * * between citizens of different States * * *."

Thus there are no disputes among co-citizens and any phase of the controversy could independently have been started as a regular diversity suit. Contrasted to this, there are at least three types of "incomplete diversity."

(2) "Diversity by alignment," where it would be possible to align the claimants into at least two sides in such a manner that all on one side have citizenship different from and interests adverse to all those on the other—though on both sides there might be rivalries among some or all of the claimants, and co-citizenship among such rivals (e. g. four rival groups of joint claimants, two groups of citizens from state A and two from state B). Thus all the claimants on either of these contrived sides could have started a diversity suit against all the claimants on the other "side," and then could have cross-claimed among themselves under Rule 13(g) (though in a regular diversity suit in this Circuit cross-claims are apparently not permitted between co-citizens. Republic Nat. Bank & Trust Co. v. Massachusetts Bonding & Ins. Co., 5 Cir., 68 F.2d 445).

(3) "Partial diversity," where there is actual diversity between all the members of two rival groups of claimants, regardless of the co-citizenship with members of either or among themselves of other *rival* claimants (e. g. three rival groups of joint claimants, one consisting entirely of citizens of state A, the other of citizens of state B, and the third of citizens of both A and B). Thus the situation is analogous to a diversity suit started between the first two groups of claimants into which the others were brought under Rules 13 and 14 (though again, if this were a regular diversity suit the citizenship of additional parties could not be disregarded in all cases. Galveston, Harrisburg & San Antonio Ry.

Co. v. Hall, 5 Cir., 70 F.2d 608; 3 Moore ¶s 13.36, 14.25–27 (1948 ed.)).

(4) "Minimal diversity," where (as here) there is diversity between some rival claimants but they are joined in interest with others who are co-citizens of their opponents (e. g. two rival groups of joint claimants, one consisting entirely of citizens of state A and the other of citizens of both states A and B). In this case no suit in diversity could have been commenced among any of the claimants.

An analysis of the leading appellate cases interpreting the statutory requirement shows that the "complete diversity" test has been rejected under every one of the interpleader acts. Professor Chafee points to five cases under the 1917 and 1926 Acts which allowed jurisdiction though it appeared that diversity among all rivals was not complete.[7] Under the more recent 1936 and 1948 Acts this interpretation has been made explicit. In Dugas v. American Surety Co., 5 Cir., 82 F.2d 953, affirmed 300 U.S. 414, 57 S.Ct. 515, 81 L.Ed. 720, both this Court and the Supreme Court, in considering the jurisdictional requirements of an ancillary injunction suit, permitted without comment a New York disinterested plaintiff to interplead ten rival claimants, six of whom were from Louisiana, two from Texas, and one each from Nevada and Oklahoma. In Cramer v. Phoenix Mut. Life Ins. Co., 8 Cir., 91 F.2d 141, certiorari denied 302 U.S. 739, 58 S.Ct. 141, 82 L.Ed. 571, the court relied on the Dugas case for the proposition that complete diversity among all rival claimants is not required, and permitted two disinterested Connecticut plaintiffs to interplead a Connecticut claimant, an Iowa claimant, and three joint claimants of whom one was a citizen of Connecticut and two of Ohio. The Supreme Court has cited the

7. Chafee, "The Federal Interpleader Act of 1936: I," 45 Yale L.J. 963, 975 (1936): Lowther v. New York Life Ins. Co., 3 Cir., 278 F. 405; Ackerman v. Tobin, 8 Cir., 22 F.2d 541; Fidelity & Deposit Co. of Maryland v. A. S. Reid & Co., D.C.E.D.Pa., 16 F.2d 502; Globe & Rutgers Fire Ins. Co. of New York v. Brown, D.C.W.D.La., 52 F.2d 164. Ross v. International Life Ins. Co., 6 Cir., 24 F.2d 345, appears to support the same proposition, and is cited therefor by Chafee, but the opinion is not entirely clear as to the citizenship of the parties.

Cramer case with approval, though only for the proposition that the citizenship of a disinterested plaintiff does not destroy interpleader jurisdiction, Treinies v. Sunshine Mining Co., supra, and this Court explicitly approved the Cramer interpretation of its earlier Dugas case in United States v. Sentinel Fire Ins. Co., supra. There the opinion of the en banc court held that statutory interpleader would be permitted where six rival interests were represented: two by individual Mississippi citizens, two by groups of joint Mississippi claimants, and one each by a citizen of Illinois and by the United States (whose participation was held to be of no jurisdictional import); the dissent argued that there was no real rivalry between the Illinois citizen and one of the Mississippi claimants and therefore there was no interpleader jurisdiction (thus suggesting a form of "minimal diversity" which the dissenters felt was insufficient to support jurisdiction under either the 1936 or the 1948 Acts). This general rejection of the "complete diversity" rule for statutory interpleader is not surprising if it is considered that the rule was originally formulated in Strawbridge v. Curtiss, supra, for normal two-sided suits—for which it operates fairly well except for occasional complicated alignment problems; its illogical extension to multi-sided situations, however, would almost completely stifle the highly valuable federal interpleader remedy by requiring that every rival interest be represented by citizens of different states.

Granted that the cases and text writers have rejected as inapplicable to statutory interpleader suits the "complete diversity" rule, it still must be agreed, we think, that it is not easy to determine precisely how "incomplete" a diversity among claimants has actually been sanctioned by the cases. This problem arises from the fact that though the courts and the text writers have stated that complete diversity would not be required they have not specifically catalogued and dealt with each of the several possible forms of incomplete diversity. Any analysis of the Dugas, Cramer, and Sentinel cases, and of Maryland Casualty Co. v. Glassell-Taylor & Robinson, 5 Cir., 156 F.2d 519, and also of the five pre-1936 Act cases shows that while the sweep of the language is more comprehensive, they all involve at most "diversity by alignment"—in fact, though the cases do not rely or even refer to it, in each instance it appears possible to find a single claimant whose citizenship and interests are diverse from that of all the others;[8] exactly the same can be said of the examples of permissible incomplete diversity set up by Moore[9] and Chafee.[10] The language, however, goes farther. Moore in one place says:

> "Supporting this rationale is the strong current of authority holding that if diversity of citizenship exists between two adverse claimants the citizenship of another *rival* claimant will not defeat jurisdiction under the Act." (Emphasis added.)[11]

And a similar passage from an earlier edition is quoted with approval in the Sentinel case;[12] this would seem to be an acceptance of the "partial diversity" test. Moreover Moore, in explaining his reason for allowing jurisdiction in an example that conforms to the "alignment test" (see footnote 9 supra) asserts:

> "The remedial purpose of the interpleader statute will be best served by following the principle that if there are two adverse claimants, whose citizenship confers jurisdiction within the principles above dis-

---

8. In Railway Express Agency v. Jones, 7 Cir., 106 F.2d 341, the citizenship of all the claimants is not set forth with sufficient particularity to determine the effective holding of the case.

9. 3 Moore ¶22.09[4]. Example (7) (1948 ed.).

10. Chafee, supra, fn. 7, at 974–975.

11. 3 Moore ¶22.09[1], at 3029 (1948 ed.).

12. 178 F.2d at page 225.

cussed, the citizenship of additional parties is immaterial."[13]

and this apparent acceptance of the "minimal diversity" test too seems to be echoed in the Sentinel case.[14]

Though apparently no appellate court has expressly dealt with facts that go as far toward the "minimal" as those here presented, none appears to have explicitly rejected a further extension and some have clearly indicated that such an extension would be approved; also at least two district courts have asserted jurisdiction with "minimal diversity." In Blackmar v. Mackay, D.C.S.D.N.Y., 65 F.Supp. 48, a disinterested plaintiff of diverse citizenship was permitted to interplead a New York claimant on the one hand against three joint claimants on the other, of whom two were citizens of New York and one of Nevada; though there might have been jurisdiction under § 1332, the court found it under the interpleader statute, presumably to permit process to run throughout the United States. In Girard Trust Co. v. Vance, D.C.E.D.Pa., 5 F.R.D. 109, a partially interested Pennsylvania plaintiff was permitted to interplead a Pennsylvania claimant against three joint claimants, of whom two were citizens of Pennsylvania and one of New Jersey. (Except for plaintiff's partial interest this is exactly on all fours with the present case.) Both cases were decided independently in 1946 under the terms of the 1936 Act. The courts used generally similar reasoning: several appellate cases are cited for the proposition that complete diversity among claimants is not required; both rely on an article by Professor Chafee[15]

for the proposition that the constitutional allowance of diversity jurisdiction is broader than that contained in the several judiciary acts which had been held limited by the Strawbridge rule; finally it is said that interpleader acts being highly remedial their jurisdictional requirements should be liberally interpreted to permit the federal courts to handle as many as possible of the cases that state courts may be unable to adjudicate completely. These two cases have been cited with general approval several times by this Court, though in support of less drastic assertions of jurisdiction.

Turning now from the examination of the cases to the statute itself, it is apparent that the words "adverse claimants, of diverse citizenship," read in a vacuum, lend themselves more easily to the adoption of a broad than of a restrictive jurisdictional test. Even in a case of "minimal diversity" there are adverse claimants of diverse citizenship. The reference to § 1332 which immediately follows in the statute is evidently meant merely to incorporate the geographic definitions of that section so as to make interpleader available with and among citizens of the District of Columbia, of the territories, and of foreign countries; the phrase was added in 1948 and was evidently meant to liberalize the 1936 Act which permitted interpleader only among the citizens of the several states—nothing indicates a congressional desire to adopt for interpleader the Strawbridge type case law restrictions that had grown up around § 1332 and its predecessors. The legislative history is inconclusive as to this precise point,[16] but it is evident

13. 3 Moore ¶22.09[4], at 3037 (1948 ed.).

14. 178 F.2d at page 224.

15. Chafee, "Federal Interpleader Since the Act of 1936," 49 Yale L.J. 377, 395 (1940).

16. In the "Hearings before the Subcommittee of the Committee on the Judiciary, U. S. Senate," on H.R. 3214, 80th Cong., 2d Sess., at p. 36, Senator McGrath introduced approving an article concerning the 1948 Judicial Code revision, 13 Law and Contemporary Problems 2116. That article, though favoring restriction of the general diversity jurisdiction, took the position (p. 239) that the extension of federal diversity jurisdiction in the Interpleader Act was a salutary development and that diversity jurisdiction might well be extended by Congress into other areas where our federal system does not now provide any adequate forum. See also pages 15 and 17 of these Senate Hearings; and see 94 Cong.Rec. 7928; "Hearing before Subcommittee No. 1 of the House Judiciary Subcommittee on

that all the interpleader acts were meant to be highly remedial, each statute since 1917 making the federal interpleader remedy more flexible and more readily available to those unable to secure complete protection in the state courts because of their geographically limited jurisdiction. That even "minimal diversity" presents such a situation is evident from the circumstances of the present case, for as the plaintiff points out in its supplementary brief, there is no way by which the bank can obtain complete protection from possible double liability by a single suit in the Texas courts, unless the Tennessee claimant submitted to jurisdiction voluntarily. Though numerous arguments have been advanced for restricting the normal diversity jurisdiction of the federal courts [17] and consequently the diversity statutes must be narrowly construed, City of Indianapolis v. Chase National Bank, supra, these considerations are not applicable to multiparty interpleader actions among claimants of various citizenships who can rarely all be subjected to the jurisdiction of a single state court. Since the courts have held that Congress did not intend to insist on the "complete diversity" test for interpleader there is nothing in the language or history of the Act that suggests that Congress did not intend to cover all instances of diversity among claimants, whether "complete" or incomplete, without excluding one or more somewhat artificially delimited subcategories of incomplete diversity whose bounds are set by irrelevant analogies to possible diversity suits among the claimants. There would seem to be every reason to suppose that Congress in this area was willing to grant the federal courts jurisdiction to the actual limits of the constitutional mandate.

The constitutional limits of the diversity grant have apparently not yet been explored by the courts in this direction; as the Supreme Court pointed out in Treinies v. Sunshine Mining Co., supra, the statutory grants in the several judiciary acts have always been conformable to the Strawbridge rule and thus were well within the constitutional grant. It appears that this characterization of the judiciary acts in the Treinies decision should not be interpreted as referring also to the statutory limits of the interpleader acts, for in the same opinion the Cramer case was cited with approval, in which the "complete diversity" test was rejected in favor of the "alignment" test which it would be more difficult to reconcile with the Strawbridge rule. The language of the constitutional provision, "Controversies * * * between citizens of different States," would permit even the most liberal "minimal diversity" test, since, at least in part, it involves such a controversy. The courts have in fact permitted ancillary and separable suits between parties not asserting diverse citizenship, where their controversy was tied to one over which the courts did have diversity jurisdiction. Barney v. Latham, 103 U.S. 205, 26 L. Ed. 514; Supreme Tribe of Ben-Hur v. Cauble, 255 U.S. 356, 41 S.Ct. 338, 65 L. Ed. 673; Dugas v. American Surety Co., supra.

■■ It may be argued that since the statutory language of the several judiciary acts conformed so closely to the constitutional one, the interpretation consistently adopted for one must necessarily apply to the other. But where language is not so clear that it can be read without any construction, it must be interpreted in line with the presumed intent of its authors. The statutes were passed by Congress while the Constitution was written by its Convention and adopted by the States, and there is no necessity for adopting the same construction for both.

H.R. 1600 and H.R. 2055," reprinted in 28 U.S.C.A. after § 2680, page 376, at pages 403 and 416–417. What little evidence there is, then, does indicate a will to broaden the jurisdiction held by the courts to exist under the 1936 Act.

17. See in Elbert v. Lumberman's Mutual Casualty Co., 5 Cir., 202 F.2d 744, the dissenting opinion of Judge Rives, affirmed 348 U.S. 48, 75 S.Ct. 151, and the concurring opinion of Justice Frankfurter at page 53, 75 S.Ct. at page 155, 99 L.Ed. 59.

In a similar instance Justice Holmes said:[18]

"But it is not necessarily true that income means the same thing in the Constitution and the Act. A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used."

And Professor Chafee, in relating this thought to the present issue argues that:[19]

" * * * constitutional language may properly be given a wider interpretation than statutory language. Since the Constitution has a broader purpose than a statute and is intended to last for much longer time, its wording should possess a flexibility which is not needed in a statute."

No Supreme Court decision has limited the generality of these words in the Constitution. It has nowhere been held that Strawbridge v. Curtiss, supra, set down the outer limits of jurisdiction under them, or that it did anything more than interpret the meaning of the Judiciary Act then before it; the unjustifiable extension of that case in another direction has long ago been criticized and rejected by the Supreme Court in Louisville, C. & C. R. Co. v. Letson, 2 How. 497, 553–555, 43 U.S. 497, 553–555, 11 L.Ed. 353.

The Supreme Court, in Treinies v. Sunshine Mining Co., supra, itself raised the question whether the Constitution might not have granted Congress broader power to legislate than it had exercised in the Judiciary Act. We think it did so, and we think Congress now by the Interpleader Act of 1948 has exercised part, if not all, of this reserved power to give additional jurisdiction to the federal courts in this limited but very important field of interpleader.

█ There is no merit to the contention that the Tennessee sister's citizenship should not be considered because she was represented in proceedings involving the estate by her Texas brother under a power of attorney. She was an actual party to this suit with a real interest in the claim.

█ We hold then that the trial court properly entertained jurisdiction of this cause and the parties were properly before the court for such disposition as was warranted on the merits.

█ Having disposed of the jurisdictional question, we turn to the merits of the appeal. Mrs. Haynes's claim is based on a tenuous line of reasoning, which is set out only in pleadings filed by her and sworn to upon information and belief with no affirmative allegation or affidavit that the money actually belonged to her husband. She asserted that her deceased husband had been in the junk business; he was a miser and had talked of putting money, including gold certificates, in the bank; he had had in his stock thermos jugs, and it was in a thermos jug that the cache was found; certain youths of the neighborhood were known to come in and out of the store, and on one or two occasions their place was broken into; and, finally, her husband was known to have wrapped his money in invoices, and a partially burned invoice of goods sold to H. V. Haynes was found near the home of Jackson Davis.

This theory of ownership asserted by Mrs. Haynes was offered to meet the affidavit of Davis to the effect that he was engaged by his plumber employer to dig a ditch in the basement of the Felder home, and that while doing so he uncovered a thermos jug containing money several thousand dollars in excess of $43,430, some of which was in the form of gold certificates; that he quit his job

18. Towne v. Eisner, 245 U.S. 418, 425, 38 S.Ct. 158, 159, 62 L.Ed. 372. See also Lamar v. United States, 240 U.S. 60, 65, 36 S.Ct. 255, 60 L.Ed. 526.

19. See footnote 15.

and went to Corsicana, Texas, to stay with his mother and spent several thousand dollars of the find; that he was later apprehended by the Dallas County sheriff and pointed out the place in the basement where he had found the money; he swore he had never seen nor heard of either Mrs. Haynes or her husband, and had never seen the damaged invoice put forward by Mrs. Haynes.

Felder's affidavit established his ownership and possession of the house and the fact that it had never been occupied by any but his family and by his father and mother who had built it. It also established the wide and successful business interests of his father. He swore to the employment of Jackson and identified the site of the plumbing work in his basement.

The Texas Supreme Court has recently held that money hidden in the manner that this was is mislaid rather than lost money, and that mislaid money is presumed to be left in custody of the owner or occupant of the premises upon which it is found, and he is generally entitled to possession of it as against all except the owner thereof. Schley v. Couch, 284 S.W.2d 333. It was this decision that caused Davis to withdraw his claim to the money. It also creates a prima facie case in favor of the Felders in light of the undisputed testimony, in view of the fact that the owner of the premises does not dispute that his father had been the true owner of the money, and thus the latter's heirs are now entitled to title as well as possession. There is no evidence to support appellant's assertion that he has taken this position in collusion with the plaintiff bank merely to introduce his Tennessee sister as co-claimant and thereby create the slight diversity upon which jurisdiction in this suit is grounded.

Nothing put forward by Mrs. Haynes directly controverts the essential facts upon which the Felder claim rests. It at most presents a theory which, if believed, might indicate the possibility that the money had once belonged to her husband. For this theory to arise, however, it would be necessary for the court to reject the unequivocal affidavit of Davis, the principal actor in the drama and the only person who could know all the facts, without the presentation of any counter-affidavit that drew in issue any essential fact sworn to by him. It is for just such a case as this that the remedy of summary judgment was designed. There was no issue of a material fact here to present to a jury. The court properly entered summary judgment for the Felders.

Judgment affirmed.