John PATTERSON et al.,
Plaintiffs-Appellees,

v.

Roy STOVALL et al.,
Defendants-Appellees,

William P. Corkill et al.,
Objectors-Appellants.

No. 75–1349.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 29, 1975.

Decided Jan. 8, 1976.

Rehearing Denied Jan. 26, 1976.

James P. Chapman, Edward T. Joyce, Chicago, Ill., for appellants.

James A. Brandvik, Daniel F. Hopp, Herbert I. Rothbart, Jeffrey Schulman, Edward A. Berman, Philip S. Wolin, Arthur M. Mintz, Michael A. Zelmar, Craig E. Anderson, Bernard Kleinman, Robert E. Cronin, Lowell H. Jacobson, Chicago, Ill., for appellees.

Before HASTINGS, Senior Circuit Judge, and SPRECHER and BAUER, Circuit Judges.

BAUER, Circuit Judge.

This appeal is brought by certain named individuals on behalf of themselves and other individuals similarly situated raising objections to a class action settlement. The sole question on appeal is whether the trial judge abused his discretion in approving the settlement. We affirm the trial court's approval of the settlement.

Appellants-objectors [1] are members of a class of plaintiffs who over a two-year period deposited money ultimately totalling approximately $9,700,000 with Rawlin L. Stovall and his company, American Cash Commodities of Missouri, Inc., both defendants herein, for investment by them in cash commodities for deferred delivery. In September, 1973, immediately prior to the defendants' indictment on charges arising out of their misuse of these funds, nu-

---

1. William P. Corkill, John Corkill, Joane Duda, James Fry, Diane Jezierski and Robert Ryan are the six appellant-objectors who equal in number .0018 percent (6 of 3,183 + 18), or approximately ⅕ of 1 percent of all depositors, having claims totalling $19,925.00 or .0022 percent of all claims. In fact, they represent approximately ⅕ of 1 percent in number and in amounts of all claims. Although in terms of the class and settlement their number and size might be considered miniscule, the serious issues raised before this Court are not reduced in their magnitude. Initially appellees maintained that the objectors had no standing to bring this appeal. In light of the total factual picture, however, there is no doubt that the objectors have standing to appeal. The fact that they accepted certain funds in settlement did not constitute a waiver since that action was taken primarily to help the plaintiff-appellees secure a disbursement from the bank.

merous suits were filed seeking class status, an accounting of the depositors' funds, and a recession of all contracts between the depositors and the defendants.

Shortly after the criminal indictments were returned against both defendants, plaintiffs requested the court to enjoin the transfer of $6,500,000 on deposit in the defendants' bank accounts. Although no injunction order was entered the money remained on deposit at the Continental Bank. On February 6, 1974, a proposed settlement was presented to the trial court and counsel for both sides requested leave to present the settlement to the class members.

Appellants, through independent counsel, filed numerous objections both to the substance of the settlement and to the procedures followed in preparing the settlement proposal for submission to the court. With one exception, appellants' objections and suggestions were overruled; the class was certified, the proposed settlement was approved for submission to the class, and notice of the class certification and the proposed settlement was sent to the class. Appellants filed objections to the form of the

notice and again asserted their objections to the proposed settlement itself. On February 20, 1975, the trial court overruled all objections, approved the settlement, and authorized a distribution of part of the sequestered funds to the class.[2]

It appears that the major stimulus for the defendants' civil settlement of the actions against Stovall was the government's agreement to accept a plea of *nolo contendere* to all counts in the indictment, except for one perjury count, to which Stovall pled guilty. Judge Marovitz received the pleas and sentenced Stovall to two concurrent five year sentences, which were immediately suspended in favor of probation under 18 U.S.C. § 3651. Judge Marovitz was fully informed of the terms of the civil settlements. On February 28, 1974, at the time of defendant's sentencing, the judge announced that the disposition of the defendants, admittedly quite lenient under all the facts and circumstances, was based in part on his intention of ordering further restitution out of settlement monies in fund "B" (discussed *infra* pp. 114–115) pursuant to the court's power under the restitution statutes.

**2.** The settlement agreement provided as follows:

"The defendants Stovall, American and Hackbarth, have submitted a Settlement Agreement for approval to the Court. The Agreement provides, in substance, that $6,500,000 (now approximately $6,800,000) (Fund 'A') will be set aside and deposited in interest bearing accounts for eventual distribution to those class members on a pro rata basis who establish their claims and to counsel for plaintiffs for their fees and expenses, as determined by the Court, in full and final settlement of all claims against Stovall, American and Hackbarth, which are alleged in the Complaints or could have been alleged by reason of or in connection with any matter or fact set forth or referred to in any of the Complaints.

'Settlement Fund A' shall consist of all the aforesaid funds and all interest accruing thereon, less $1,000,000 allocated to 'Settlement Fund B'. Upon its establishment by court order, 'Settlement Fund A' shall be available to all plaintiff-depositors who shall participate in this settlement by filing ac-

ceptable claims for refund (which shall be limited to the amount of monies deposited, exclusive of interest, profits and other increments) with the Court, and for claimants who do not file, but may be equally entitled to a refund; 'Settlement Fund A' shall be used for the pro rata distribution of all such claims, subject only to actual costs of administrating said funds which are necessarily incurred by consolidated class counsel, costs in mailing distribution after notice, and reasonable costs and attorneys' fees to consolidated class counsel.

The approximate sum of $1,000,000 (Fund 'B') will be set aside in interest bearing accounts and subject to claims of any creditors who are not depositors, the claims of depositors who choose to litigate their claims, claims of the Internal Revenue Service, and of any creditors who are not depositors, defendants' attorneys' fees and costs of any fines imposed against defendants in the criminal proceedings before Judge Abraham L. Marovitz. In the event any funds remain in Fund 'B' after payment of all claims herein described the balance shall be turned over to American."

This point was again restated by the court on September 20, 1974. Nevertheless, the language of the settlement agreement reached by the parties states that any money remaining in fund "B" will be turned over to Stovall's company. Depositors who were reimbursed out of fund "A" are barred from claiming or receiving further amounts from fund "B". Thus Judge Marovitz' intention to order further restitution appears to conflict with the language of the settlement agreement.

We believe that this apparent conflict must be interpreted in favor of the depositors. Since Judge Marovitz' handling of the criminal proceedings greatly influenced the settlement of the civil cases we do not believe that the wording of the agreement should be read to usurp his power to order restitution[3] —an action which he clearly indicated he would take on two separate occasions. If in the future, he should decide that as a condition of probation defendants must

3. Under 18 U.S.C. § 3651 the sentencing judge clearly has the power to make restitution a condition of probation. Section 3651 states, inter alia:

"[W]hile on probation and among the conditions thereof, the defendant may be required to pay a fine in one or several sums; and may be required to make restitution or reparation to aggrieved parties for actual damages or loss caused by the offense for which conviction was had; . . . "

4. The transcript of proceedings on February 28, 1974 before Judge Marovitz indicates that attorneys involved in the civil suit were present for the defendants' sentencing and that the following colloquy took place:

"By Mr. Montana (prosecutor):

"Through various discussions with our office, it is my understanding that our office has agreed that in the unique situation of this case, because of the availability of the money, that we would not oppose and in fact would suggest to the Court that probation be imposed under the strictest condition and that is that this Court maintain power and jurisdiction over those settlement funds; that as complete restitution as possible be made to the victims for the monies that Mr. Stovall fraudulently took from them; that the Court is sure that the defendant does not profit substantially from his fraud . . . [Tr. 4].

make restitution by paying out of money left over in fund "B" in the criminal case such an order would not violate the settlement agreement reached in the civil suit. Thus the most compelling argument of objectors that Stovall still remains a millionaire, despite his nefarious activities in defrauding depositors, his criminal conviction, and the multiple lawsuits filed against him, is not really valid since Judge Marovitz still retains the power to order restitution to depositors from any funds remaining with Stovall or his company in fund "B".

As the Court of Appeals we have no power to rewrite a settlement agreement reached by the parties. However, we do have the authority to approve or disapprove a class action settlement after considering any objections raised. Our approval in this case is based upon our interpretation of the agreement entered into after the parties were made aware of Judge Marovitz' intentions.[4]

By Mr. Branvik (attorney for defendant):

Your Honor, I have explained to Mr. Stovall, following our discussions that this Court will maintain jurisdiction to review the terms of the settlement and also particularly the contents of Fund B under the settlement at the end of the civil litigation and that this Court will determine, will have the power to determine at such time, whether a fine or other conditions should be imposed with respect to that Fund B settlement as to Mr. Stovall and he understands it, your Honor.

The Court: Does he consent to it?

Branvik: Yes, your Honor.

The Court: Is that correct, Mr. Stovall?

The Defendants: Yes, sir, it is [Tr. 6].

\* \* \* \* \* \*

By the Court:

Well, this Court will impose a sentence on each count of five years and suspend the sentence, and also by agreement of the defendant in his own proper person and through his counsel suspend the imposition of a fine on each of these counts until September 20th or any other earlier or later date within the period of the probation depending upon the determination of the civil case which will establish the amount of money left in the B fund.

It is the Court's intention then to order restitution and impose such fines as the Court deems just under the circumstances."

■ Our approval is also based upon the principle that an appellate court will only intervene and upset a settlement upon a clear showing that the trial court committed an abuse of its discretion. *State of West Virginia v. Chas. Pfizer & Company,* 440 F.2d 1079, 1085 (2d Cir. 1971); *Newman v. Stein,* 464 F.2d 689, 692 (2d Cir. 1972); *United Founders Life Insurance v. Consumers Nat'l. Life Insurance,* 447 F.2d 647, 655 (7th Cir. 1971). Courts of review generally will consider the facts of a settlement in a light favorable to promoting settlements. As the Court of Appeals for the Fifth Circuit stated in *Florida Trailer and Equipment Co. v. Deal,* 284 F.2d 567 (1960):

"Of course, the approval of a proposed settlement does not depend on establishing as a matter of legal certainty that the subject claim or counterclaim is or is not worthless or valuable. The probable outcome in the event of litigation, the relative advantages and disadvantages are, of course, relevant factors for evaluation. But the very uncertainties of outcome in litigation, as well as the avoidance of wasteful litigation and expense, lay behind the Congressional infusion of a power to compromise. This is a recognition of the policy of the law generally to encourage settlements. This could hardly be achieved if the test on hearing for approval meant establishing success or failure to a certainty. Parties would be hesitant to explore the likelihood of settlement apprehensive as they would then be that the application for approval would necessarily result in a judicial determination that there was no escape from liability or no hope of recovery and [thus] no basis for a compromise."

In light of this standard we shall review each of the major objections to the settlement raised by this appeal.

■ Appellant-objectors submit that the proponents of the settlement agreement did not create a sufficient factual record to permit the trial court to make a proper determination that the agreement was fair, reasonable and adequate. Specifically they argue that they were denied sufficient discovery before the settlement which would have enabled them to evaluate Stovall's claims for commissions, the potential costs of a trial, and the probability of multiple appeals. In addition they question the defendants withdrawing their motion to dismiss for want of jurisdiction. Since the question of jurisdiction can never be waived by the parties we have reviewed the record *sua sponte* on this issue and believe that one or more alternate grounds for federal jurisdiction does exist.[5]

■ Obviously an evidentiary hearing is not required before the settlement of every case. Under Rule 23 the trial court must be more vigilant over class settlements because of the rights of the

5. On appeal none of the parties have argued that this Court does not now have jurisdiction. However the question was seriously raised in the trial court before defendants withdrew their motion to dismiss. Despite that withdrawal the District Court would have no authority to approve the settlement had it lacked jurisdiction. However we believe jurisdiction was available on a number of different theories. First, Judge Marovitz clearly had jurisdiction of the criminal suit and he conditioned his sentence in that case on the return of the depositors funds. Thus even if the civil suits were without jurisdiction he could approve the settlement as a condition of probation. Second, although class members cannot aggregate their claims in a diversity case, *Snyder v. Harris,* 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969); *Zahn v. International Paper Co.,* 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973), at least some of the claimants could individually satisfied the $10,000 limitation. Third, jurisdiction might exist under either the Commodity Exchange Act §§ 4 and 6(b) or the Securities Exchange Act. Fourth, even if the case was dismissed on jurisdictional grounds the bank could clearly re-file the same case with the same parties under the statutory interpleader section, 28 U.S.C. § 1335, which requires only minimal jurisdiction of claimants. See *State Farm Fire & Cas. Co. v. Tashire,* 386 U.S. 523, 530–1, 87 S.Ct. 1199, 18 L.Ed.2d 270 (1967); *Haynes v. Felder,* 239 F.2d 868 (5th Cir. 1957). Cf. *State of West Virginia v. Chas. Pfizer & Co.,* 314 F.Supp. 710 (S.D.N.Y.1970), aff'd 440 F.2d 1079 (2d Cir. 1971).

absent class members and because sometimes counsel may appear to be too eager to settle in order to guarantee themselves a fee for their professional services. However a review of the settlement agreement here indicates that its genesis was on January 14, 1974 when Stovall's counsel were engaged in plea bargaining with the government. The class determination was not made until July 12, 1974, and all the parties were given until October 3, 1974, to determine whether the agreement was to be approved or to present their objections. At the October 3rd hearing appellant-objectors requested additional discovery and the court granted additional time to pursue discovery. They were allowed to depose Stovall, Hackbarth, the accountant, and any bank or financial institution they chose.[6] Unfortunately, this additional discovery did not produce any new information that would materially affect the settlement. Subsequently the court received various reports from the objectors and other parties in the action and entered an order on February 20, 1975 giving final approval to the settlement. There is no evidence of the trial court abusing its discretion. The court was most patient in allowing the appellant-objectors to pursue whatever discovery or investigations they desired over a period of eighteen months. Thus, objector-appellants misplace reliance on *Cohen v. Young,* 127 F.2d 721 (6th Cir. 1942) where the court summarily dismissed the objectors' petition to intervene and denied them the right to produce evidence.

The objectors' main argument is similar to that pursued by *Greenspun v. Bogan,* 492 F.2d 375 (1st Cir. 1974), where the trial court had approved a derivative action settlement. Certain parties appealed claiming that the District Court abused its discretion because it failed to conduct an independent evaluation of the settlement and because it received more supporting data after giving its tentative approval. In considering this issue, the Court stated at p. 378 of the opinion:

"Appellants contend that the district court could not have exercised independent judgment because it lacked sufficient evidence to show the fairness of the proposed settlement. They point to the fact that the court had access to only two depositions concerning the proposed fee schedules, both of which were conducted after the March 19th announcement that an agreement had been reached 'in principle' between the parties of the derivative action. Moreover, two volumes of exhibits and documents were given to the court on the eve before it approved the settlement, giving rise to the speculation that the court did not have a full opportunity to review their contents. And appellants point, most particularly, to the fact that the court did not have any documents in its possession which could show that the proposed fee schedule was comparable to the fee schedules of other similar real estate investment trusts and their advisors.

While the district court's evaluation of the proposed settlement may not have been as comprehensive or intensive as it could have been, appellants have failed to show that the district court clearly abused its discretion in approving the settlement because it lacked sufficient evidence upon which an independent appraisal [could] be based" (492 F.2d at 378).

**6.** Appellant-objectors claim that their discovery was limited in that they were not allowed to question the defendant about his potential liability. They requested the court to direct Stovall to answer the questions. The court refused to order the defendant to answer. We believe it was within the ambit of the trial court's discretion to refuse to order the answers. Since settlement negotiations had neared fruition with the vast majority of class members the court may have decided that the only inquiry that was proper dealt with the extent of Stovall's assets. In addition, Stovall may have had a privilege under the Fifth Amendment not to answer the questions. Normally, however, we would consider it an abuse of the court's discretion not to order a defendant to answer questions concerning his acts and possible liability in a civil case.

■ In the instant case the trial court had sufficient facts before it to make an informed judgment. Perhaps holding an evidentiary hearing may be the better practice; the failure to do so however does not constitute a per se abuse of discretion. The court had ample opportunity to gain familiarity with the subtleties of the proposed settlement. Memoranda in support of the settlement as well as objections were presented to the court. Further, the court had access to numerous documents, exhibits, a computer print-out of depositors and amounts invested, a transcript of the proceedings in the criminal case, a summary of the government's evidence, and, the benefit of dozens of appearances by counsel for the plaintiffs and defendants.

■ In reviewing a proposed settlement the court should consider the judgment of counsel and the presence of good faith bargaining. *Newman v. Stein, supra* p. 111. Courts usually refuse to substitute their business judgment for that of counsel, absent fraud or overreaching. As stated in *Zerkle v. Cleveland-Cliffs Iron Co.,* 52 F.R.D. 151 at 159 (S.D.N.Y. 1971).

"The Court will not substitute its business judgment for that of the parties; 'the only question . . . is whether the settlement, taken as a whole, is so unfair on its face as to preclude judicial approval.' *Glicken v. Bradford,* 35 F.R.D. 144, 151 (S.D.N.Y. 1964) . . . ."

■ The trial judge should not attempt to decide the merits of the controversy where the parties have reached a settlement. Any virtue which may reside in a compromise is based upon doing away with the effect of such a decision. *Woods & Selick, Inc. v. Todd,* 282 U.S. 881, 51 S.Ct. 85, 75 L.Ed. 777 (1930); *Schleiff v. Chesapeake & Ohio Ry. Co.,* 43 F.R.D. 175, 178–179 (S.D.N.Y.1967); *City of Detroit v. Grinnel Corp.,* 495 F.2d 448 (2d Cir. 1974); "Factors Considered in Determining the Fairness of a Settlement," 68 N.U.L.Rev., p. 1145. As Judge Wyatt stated in *Schleiff, supra :*

"In determining whether to approve the compromise or not, the Court does not try out the disputed issues. The compromise was agreed to for the purpose of avoiding just that" (43 F.R.D. at 178).

■ Appellant-objectors are asking this Court to upset a settlement which returns 80 to 90% of the original investment of the class members plus allows plaintiffs an option to pursue a 100% recovery. This settlement compared to much of the litigation in the federal courts is imminent fair and reasonable.

The creation of funds "A" and "B" is the result of negotiations between plaintiffs and defendants. It is a division of Stovall's assets accumulated from the scheme and acquired during the period described in the complaint. The trial court did not create the divided funds. The parties chose it as a method to provide defendants an incentive to settle.

Fund "A" consisted of approximately 6.8 million dollars set aside and deposited in interest bearing accounts for pro rata distribution to class members who agreed to the settlement. The majority of the money in fund "A" has already been paid out to depositors.

Fund "B" consists of one million dollars set aside to provide for those depositors who opt out of the settlement agreement of fund "A", claims by the Internal Revenue Service for taxes, claims by any creditors who are not depositors, and, any costs, fines or restitution payments resulting from the criminal proceedings before Judge Marovitz. Claims on fund "B" by depositors amount to approximately $48,000. The Internal Revenue Service has subpoenaed the records of defendants but no claims have been made at this time. Judge Marovitz has not yet ordered any restitution of monies from this fund as a condition of probation because not all of the money in fund "A" has been distributed nor have any of the other potential claims on fund "B" been made.

Appellant-objectors submit that the trial court had no basis for establishing

the fund "B"; that the claims of the Internal Revenue Service cannot possibly amount to one million dollars, consequently Stovall and his company, American, stand to profit handsomely from the settlement. As we stated previously, Judge Marovitz still has the power to order restitution from fund "B". As to the potentially large claims of the Internal Revenue Service we issue no opinion at this time. Nevertheless it is difficult to believe that Stovall stands to make a profit because of wrongdoing.

■ Assuming *arguendo* that the defendants were to come out of the settlement with money remaining in fund "B" (a decision that largely rests within Judge Marovitz' discretion), that fact alone would not make the settlement unreasonable. A settlement by its very nature is an agreement where both sides gain as well as lose something. It is clear that by settling Stovall was able to maintain his freedom. But he also gave up a potentially large claim for "handling fees", he gave up his seat on the Chicago Board of Trade, as well as his constitutional right to a jury trial and the raising of any legitimate defenses. In addition he has to serve a period of five years of probation during which he will not be allowed to trade on behalf of anyone other than himself.

■ Finally appellant-objectors contend that the court improperly relied upon the J. K. Lasser Company reports which gave an accounting of the Stovall assets. They submit the reports are without integrity because their author, Mr. Adelman, did not express an opinion, as is the usual practice by accountants; and, the fact that the reports did not constitute a full and complete audit of accounts, liabilities, and assets. Appellant-objectors advised the trial court of numerous deficiencies in the report and requested the appointment of an independent expert to evaluate the defendants' financial status. That request was denied after both plaintiffs and defendants attempted to explain the discrepancies in the Lasser Co. reports.

In response to this argument appellees now point out that the accuracy of the reports has been verified by the settlement itself. As of June 24, 1975, a total of 3143 claims were either filed, approved, or paid. This was out of an original 3369 depositors. Subsequent verification showed that many persons had three or four accounts and that the true number of located individual depositors came to 3143. These class members have all verified that their accounts were correctly reflected in the defendants' records which were the materials upon which the Lasser reports were based.

Moreover, the total claims amount to $8,755,546 as of this date, with only a few claimants to be located. This figure is very close to the estimated deposit figure of $8,900,000 used in the settlement and the J. K. Lasser Co. computation. $6,063,274.50 has been paid to class members whose names and addresses and amount of deposits were taken from the Hackbarth computer print-out and the J. K. Lasser reports. Even though the Lasser reports initially may have been questionable, their accuracy has been borne out of the disbursement of the settlement funds. No error was committed in relying on the reports in approving the settlement.

Accordingly, the judgment of the trial court is affirmed.

Affirmed.