GERTRUDE E. CASE et al., as Stockholders of MAHONING COAL RAILROAD COMPANY, on Behalf of Themselves and All Other Stockholders Similarly Situated, Appellants, *v.* NEW YORK CENTRAL RAILROAD COMPANY et al., Respondents, et al., Defendant.

First Department, October 29, 1963.

*Herbert Prashker* of counsel (*Charles Poletti, Bruno Schach-ner, Everett Lewis* and *Arnold Hoffman* with him on the brief; *Poletti Freidin Prashker & Harnett* and *Abramson & Lewis*, attorneys), for appellants.

*Thomas F. Daly* of counsel (*Reigh F. Klann, John A. Gray* and *Saul L. Sherman* with him on the brief; *Lord, Day & Lord*, attorneys), for respondents.

McNALLY, J.  This minority stockholders' action involves the right to tax savings resulting from the filing of Federal consolidated income tax returns by defendant New York Central Railroad Company (Central) for and in behalf of itself and its affiliates for the period September 11, 1957 to December 31, 1957 and annually thereafter.

Plaintiffs are minority stockholders of Mahoning Coal Railroad Company (Mahoning), one of Central's affiliates. Since 1884 Central or its predecessor has owned a majority of the common stock of Mahoning; and since September 11, 1957 Central has owned 80% thereof.  Central is the lessee of Mahoning's railroad under agreements dated July 1, 1884 and October 1, 1889.  Thereunder Central pays all maintenance and operating expenses of the railroad and in addition pays to Mahoning 40% of gross earnings.  Mahoning therefore enjoys what the brief of defendants-respondents describes as " practically guaranteed taxable income into the indefinite future ".

The agreement dated August 18, 1955 among Central and 34 of its affiliates, not including Mahoning, is entitled "Agreement For The Allocation Of The Federal Income Tax Liability Among The Members Of The New York Central Railroad Company Affiliated Group". It provides for the allocation of income tax liability and for credit by the corporations benefiting from net operating losses to any member of the affiliated group who on a separate return basis would have a net operating loss "but whose deduction therefor, when carried back or carried forward, is reduced or eliminated by its joinder in the consolidated return" in an amount equal to the tax thereby offset.

On January 3, 1958 Mahoning became a party to the agreement of August 18, 1955. Thereafter Central caused the consolidated returns here involved to be filed.

The impact of the income tax liability of Central and its affiliates is on Central and Mahoning. The other affiliates are either wholly owned by Central or lessors of Central under leases requiring it to pay the lessors' Federal income taxes, with the exception of one affiliate which is so operated that its expenses equal its income presenting no taxable gain. The so-called allocation agreement therefore operates solely against Central and Mahoning and is innocuous as to the other affiliates.

This litigation in its final analysis therefore involves Central and the minority stockholders of Mahoning. Had Mahoning filed separate returns for the years 1957–1960, its total tax would have been $3,825,717.43. The filing of consolidated returns effected a saving of the entire amount thereof. Central caused Mahoning to allocate to itself therefrom the sum of $3,556,992.15. The net tax saving to Mahoning was $268,725.28, 20% of which, or $53,751.05, represents the dividend expectancy of the minority stockholders. If the dividend materializes, Central will have syphoned off $3,771,966.38 from the total tax savings of $3,825,717.43, and the minority stockholders will have received $53,751.05, or less than 1.5% of the total savings against their 20% stock interest.

The disproportionate distribution of Mahoning's tax benefits was predictable and the inevitable result of the formula contained in the allocation agreement. Mahoning's guaranteed income precluded a net operating loss which was the *sine qua non* of a benefit credit in respect of any tax benefit resulting from a consolidated return under the allocation agreement. On the other hand, Central could avail itself not only of its operating losses but also of those of its 34 affiliates other than Mahoning. Finally, by reason of its 80% ownership of the common stock of

Mahoning, Central stood to gain, in addition to the amount of the allocation of tax benefits consequent on a consolidated return, 80% of the tax benefit remaining to Mahoning. Despite the 20% common stock ownership of the minority, it was impossible for it to enjoy but a small fraction of one fifth of the tax benefit.

We need not dwell at length on the domination and control of Mahoning by Central. Immediately prior to Mahoning becoming a party to the allocation agreement, Central owned in excess of a majority of Mahoning's voting stock and had nominated all the directors, of whom five were officials of Central and one an official of one of its subsidiaries, all of whom received compensation from Central or its subsidiaries, other than Mahoning. Mahoning's officers were also officers and employees of either Central or its subsidiaries. The allocation agreement was prepared by Central's director of taxes who was also Mahoning's director of taxes. No independent tax expert or legal counsel aided or advised Mahoning thereon.

Insofar as business transactions between Mahoning and Central, the latter stood in a fiduciary relationship to Mahoning's minority stockholders. (*Ripley* v. *International Rys. of Cent. America*, 8 N Y 2d 430, 436; *Kavanaugh* v. *Kavanaugh Knitting Co.*, 226 N. Y. 185, 195–196; *Farmers' Loan & Trust Co.* v. *New York & Northern Ry. Co.*, 150 N. Y. 410, 427, 429–430.) The enormous tax benefits to Central resulted from net operating losses which so far as this record establishes never ripened into operating loss deductions because even if separate returns had been filed by Central they would not have demonstrated taxable gains against which net operating losses could have been applied by way of deductions.

The primary issue is whether among affiliated corporations qualifying to file a consolidated tax return the resulting savings may be allocated almost exclusively to the dominant corporation. The losses which must be offset against profits and the profits which must be offset against losses within a system qualifying for a consolidated return are each essential to the tax savings which result. As a consequence each has value. True, this value may vary depending upon whether the persistence of losses or the persistence of profits is more or less true for the corporation which contributes the offsetting profits or the offsetting losses to the scheme. As between independent bargainers, and concededly there cannot be independent bargains among the affiliates in an affiliated system, there would be room for evaluating the economic value of the included profits and losses. And, of course, the personal ability of bargainers would play a significant role.

One must accept the inevitable fact that there cannot be effective independent bargaining among affiliates. Nevertheless, the obligations of the dominant corporation as a fiduciary on behalf of its own and the minority stockholders of the other affiliated corporations persist and fairness is required. In this case one thing is clear, namely, that appropriation of all of the tax savings except for the minimal amounts involved on intercorporate dividends is not fair.

While Central has a cogent argument in pointing out that it invested $1,000,000 to purchase additional stock in order for Mahoning to qualify as one of the eligible affiliates, this was not an act of Central that was a matter of free choice. On the facts here, in view of the obvious savings to the system and its own stockholders, vastly greater than the $1,000,000 investment involved, Central had a duty to qualify Mahoning by increasing its investment in Mahoning up to the requisite 80% and to maintain such investment. Mahoning, too, had an obligation to participate in the filing of a consolidated return and, in advance, in consenting to Central's increased investment in Mahoning in order that Mahoning might qualify as an eligible corporation. It owed its stockholders, in short, a similar duty to effect tax savings. But it would seem clear enough that included in that duty, apart from the intercorporate dividend savings, was Mahoning's obligation not to part with all of the resulting savings from the filing of a consolidated return. Indeed, if it could retain no part of the savings, it might well be argued that Mahoning had no duty to participate in the scheme.

In the *Western Pacific R. R.* case (345 U. S. 247, see connected case, *infra*) Mr. Justice JACKSON, in an opinion dissenting from a procedural ruling, discussed the merits of a case involving the issue here. He appropriately stated (p. 277): "Each of these parties had but one key, and how can it be said that the holder of the other key had nothing worth bargaining for?"

On this view, it is not concluded, nor need it be concluded at this time, what the proportionate allocation between Mahoning and Central should be. It suffices, however, that a total appropriation of the savings by Central is not fair. Since it is not fair, the existent allocation agreement, to the extent that it so provides or permits, should not be enforced. Or, if the course of dealing between Mahoning and Central so provides or permits, it is not justified as fair between dominant and dominated corporations. Under the circumstances, with respect to the past, the tax savings should fall where they do without benefit of allocation, the allocation provisions of the agreement as con-

strued by Central being insufficient to make a fair and just apportion. Therefore, the amounts improperly paid by Mahoning to Central should be refunded by Central.

In the absence of the allocation agreement, Mahoning would have been entitled to retain the tax benefits resulting from the consolidated returns. (*Western Pacific R. R. Corp.* v. *Western Pacific R. R. Co.*, 85 F. Supp. 868, affd. 197 F. 2d 994, 206 F. 2d 495.)

*Alliegro* v. *Pan Amer. Bank of Miami* (136 So. 2d 656, affd. 149 So. 2d 45 [Fla.]) holds the payment of such tax benefits by a subsidiary to its parent corporation is the equivalent of dividends which may not be paid to the exclusion of the minority stockholders. We do not reach that question at this time.

Although the facts in the *Western Pacific* and *Alliegro* cases are dissimilar, they both stand for the proposition that where there is domination the dominant party must be fair.

We are satisfied on this record that the individual nonprofiting defendants-respondents acted solely in reliance on the advice of Mahoning's director of taxes. The judgment in their favor dismissing the complaint should be affirmed, without costs. (*Chelrob, Inc.,* v. *Barrett*, 293 N. Y. 442, 462.) The judgment should be reversed as to defendant-respondent Central, on the law and on the facts, with costs to plaintiffs-appellants, and an interlocutory judgment granted directing said defendant-respondent to account for all sums received from Mahoning consequent on tax benefits resulting from consolidated returns reflecting the earnings of Mahoning.

STEUER, J. (dissenting). We have no quarrel with the facts as stated in the majority opinion and see no need to restate them.

The stockholders of Mahoning for a period of over 75 years have been in the position of landlords of a property whose only function has been to receive the rent which Central guaranteed to them. During all this period Central controlled Mahoning and despite this fact, and despite the fact that Mahoning's board of directors were, as the majority points out, the nominees of Central, the lease has continued to the great profit of Mahoning, including its minority stockholders. In 1957 Central acquired additional stock of Mahoning. There can be little doubt that this acquisition was for the purpose of allowing Central to include Mahoning in the allocation agreement and to file consolidated returns. Nor can there be any doubt that this is a perfectly legitimate and proper transaction, authorized and approved by the taxing authorities.

Prior to Mahoning's becoming a party to the agreement, Mahoning perforce paid in full its Federal income tax, and the

return to its stockholders was diminished by the amount of that tax. For the years under consideration, pursuant to the agreement, Mahoning paid no taxes. This was due to the circumstance that in each of these years Central had operating losses which exceeded Mahoning's profits. By the terms of the agreement Mahoning paid the amount it would have had to pay as taxes to Central. If the agreement had no further provisions, it will be seen that the resulting situation would be that 20% of Mahoning's stockholders would be in no worse position than they would have been in had there been no agreement, and Central, as the 80% stockholder, was in a better position. But that is not as far as the agreement went. By the formula provided in the agreement Mahoning received back a portion of the overall tax saving effected. This sum, whatever it might have been, or whatever percentage of the amount that would otherwise have gone as taxes, represents income that Mahoning's minority stockholders would never have realized had there been no agreement.

To speak of the payments made by Mahoning to Central as dividends or gifts is a total misconception of the relationship of these parties. The tax provisions in effect mean that where there is a consolidated railroad system, that is, where one of the roads owns all or virtually all of the stock of the others, the systems may file a consolidated return. "Virtually all" means 80% or more. Advantages will accrue to the taxpayer only in the event that one road has a loss which can be offset against profits of the other. In this situation the taxing authorities allowed, where the conditions were met, a realistic tax to be calculated. But this is necessarily on the theory that there was a single, consolidated operation.

It must be remembered that Mahoning is entirely dependent on Central for its income. As long as Central can pay the rent, Mahoning will prosper. If Central should ever become unable to do so, Mahoning is in an unenviable position. It is therefore greatly to Mahoning's interest that Central should continue to be in a position to pay the rent called for in the lease. By being in a position to strengthen Central financially without loss to itself, and being able at the same time and by the same means to increase its own income to some extent, Mahoning is obtaining a very material advantage. To say that there is no consideration for the agreement is to overlook the realities.

The majority opinion points to the composition of Mahoning's board and concludes that the agreement was one made by Central with itself. No one can dispute the fact or the conclusion. But this is the kind of agreement that only can be made by a board so

dominated. Unless Central owned at least 80% of Mahoning's stock it could not file a consolidated return, and no agreement was possible. And 80% of the stockholders in any corporation can certainly elect the directors. And while those directors are, in a sense, fiduciaries of the minority, they are entitled to contract for the benefit of the corporation, which is, by definition, largely the majority. In making this agreement the directors imposed no burden on the minority that they did not already have. Their return was to no extent diminished. In fact, it was increased. It was not increased to the extent that the majority, Central, benefited. But this fact does not imply that the directors were false to their trust. And this is so even if the disparity is great.* Even if this were an arm's length transaction, it would be extremely difficult, if not impossible, to determine what would be fair. Here both corporations have an asset or, more accurately, are in a situation where by joint action they can benefit, but neither can benefit without the other. And further, neither could get the same or even remotely similar benefits by the participation of any third party. So there is no possibility that the terms to be agreed upon would be ascertained by what someone else would offer in a competitive situation. Traditionally, what is fair is what these two parties would agree on. But actually in such a situation the terms of agreement would depend almost entirely on the bargaining ability and the personal characteristics of the parties. Such factors defy the making of an estimate of the result that would be reached. Both parties to this suit recognize this. A great part of the energy expended by counsel was in an effort to show that the burden of proving fairness or unfairness was on the other side, and each having established (at least to his own satisfaction) that it was on his adversary, each relied on the fact that it was impossible for the other to make the proof. When the factor is added that this agreement could not be made by disinterested parties, it must be the rule that anything short of gross and palpable overreaching does not warrant court interference.

It would be hard to imagine, if a plan were presented to any taxpayer whereby he would have his tax obligation discharged, by the simple device of paying to X (any third person) the amount of his taxes, and receive a rebate of 6 or 7% of the tax, that this would be refused. Nor could the taxpayer be deemed to be overreached because he did not get a larger rebate.

---

* The transaction here allows of many different ways of calculation of the net gains to the parties involved. The figures given in the majority opinion are on a basis which would show the greatest disparity. According to other methods, the benefit to the minority would be considerably enhanced.

. Furthermore, the relief awarded is not in accord with any equitable principle. The agreement is rescinded and Central is to account to Mahoning for all tax benefits received, that is, for all that Mahoning has paid. The consequences of this determination are in some doubt, dependent on the attitude to be taken by the Department of Internal Revenue. If that department of the Federal Government takes the decision literally, then neither Central nor Mahoning ever had the right to file a consolidated return and Mahoning is in default for failing to file a return and pay its taxes. The consequence, particularly if interest is assessed, may well result in a serious loss to Mahoning, and must result in some loss. By so doing the minority suffers, and its gratification with the result can only be that the majority suffers more. If the returns are accepted as filed, Mahoning is then in the position of paying no taxes and having the money also. The principle of equity by which it becomes entitled to this outcome escapes us.

The judgment below dismissing the complaint should be affirmed.

BREITEL, J. P., and STEVENS, J., concur with McNALLY, J.; STEUER, J., dissents in opinion, in which EAGER, J., concurs.

Judgment reversed as to defendant-respondent New York Central Railroad Company, on the law and on the facts, with costs to plaintiffs-appellants, and an interlocutory judgment granted directing said defendant-respondent to account for all sums received from Mahoning Coal Railroad Company consequent on tax benefits resulting from consolidated returns reflecting the earnings of Mahoning Coal Railroad Company. Settle order on notice.