Sidney SCHLEIFF and Sylvia Brimberg, as Executors of the Estate of Oscar Schleiff, Deceased, Plaintiffs,

v.

The CHESAPEAKE AND OHIO RAILWAY COMPANY and the Baltimore and Ohio Railroad Company, Defendants. Action No. I.

Richard H. GOLDBERG, Plaintiff,

v.

The BALTIMORE AND OHIO RAILROAD COMPANY and the Chesapeake and Ohio Railway Company, Defendants. Action No. II.

Jack J. SCHNAPP, Plaintiff,

v.

The CHESAPEAKE AND OHIO RAILWAY COMPANY and the Baltimore and Ohio Railroad Company, Defendants. Action No. III.

Sidney SCHLEIFF and Sylvia Brimberg, as Executors of the Estate of Oscar Schleiff, Deceased, Plaintiffs,

v.

John D. BIGGERS, and others, Defendants. Action No. IV.

Nos. 64 Civ. 3478, 64 Civ. 3477, 64 Civ. 3785 and 64 Civ. 3855.

United States District Court S. D. New York.

Nov. 8, 1967.

Pomerantz, Levy, Haudek & Block, New York City, for plaintiffs. Abraham Pomerantz, New York City, of counsel.

Donovan, Leisure, Newton & Irvine, New York City, for The Chesapeake and Ohio Railway Co. Carl E. Newton, William P. Moyles, New York City, of counsel.

Alexander & Green, New York City, for The Baltimore and Ohio Railroad Co. Eugene Z. Du Bose, New York City, of counsel.

James Bostwick, pro se.

Lipper, Shinn, Keeley & Dannenberg, New York City, for Edward Quirke. Richard B. Dannenberg, New York City, of counsel.

Morris Golding, pro se.

Arthur Sabo, pro se.

WYATT, District Judge.

This is an application under Rule 23.1 of the Federal Rules of Civil Procedure for approval of a compromise of these four derivative actions brought by shareholders of The Baltimore and Ohio Railroad Company (B & O). The defendants are The Chesapeake and Ohio Railway Company (C & O) and B & O itself, for whose benefit the actions were brought. In one of the actions (No. IV), a number of individual defendants were named; these were said to have been directors of B & O at various times and some of them were also said to have been directors of C & O.

By order filed May 9, 1967, notice was required to be given by mail to all B & O stockholders of a hearing to be held on August 17, 1967, to consider approval of the compromise. The form of the notice and the explanations to be made therein were specified in the order. An affidavit of the Secretary of B & O establishes that the notice was mailed as required.

The notice was directed to be mailed to all stockholders of B & O on June 23, 1967. On that date, B & O had 3,163,012 shares of preferred and common stock outstanding, of which 2,886,491 (or about 91%) were owned by C & O and 276,521 shares were publicly held by 2445 stockholders.

The hearing was duly held on August 17. Three stockholders, owning in the aggregate 1000 shares of B & O common, appeared in person to oppose the compromise and one stockholder, owning 700 shares of B & O common, appeared in person and by counsel to oppose.

After hearing the proponents and opponents of the compromise and after considering the statements made at the hearing, exhibits received, and the memoranda submitted, I conclude that the compromise should be approved.

These four actions complain because B & O on September 21, 1964 sold to Otis & Co. at $12 per share 300,000 shares of common stock of Reading Company, an operator of railway lines in Pennsylvania and New Jersey. In one of the actions, there is an added complaint that various transactions between B & O and C & O violated Section 10 of the Clayton Act (15 U.S.C. § 20).

C & O acquired control of B & O, effective February 4, 1963, having secured the approval of the Interstate Commerce

Commission (ICC). Chesapeake & O. Ry. Co.—Control—Baltimore & O. RR. Co., 317 I.C.C. 261 (1962).

C & O acquired control of B & O by an offer to the stockholders of B & O to exchange C & O shares for their B & O shares. It was originally a condition of this offer that it be accepted by holders of 80% of the B & O shares, doubtless to permit the filing by the two corporations of consolidated tax returns (26 U.S.C. §§ 1501, 1504). C & O later agreed in substance to waive this condition and at the time the Commission was considering the matter the holders of about 61% of the B & O shares had accepted.

After the ICC approved control of B & O by C & O, it also approved of many persons being at the same time officers or directors or both of the two roads.

In January 1964, C & O sold its Toledo pier facilities resulting in a long-term capital gain in excess of forty-nine million dollars. In March 1964, the C & O purchased an additional 20% of B & O's capital stock from the New York Central Railroad Company and the Alleghany Corporation. This gave the C & O the necessary 80% ownership of B & O to file a consolidated tax return for 1964 with B & O.

The Reading shares in the hands of B & O had a high historical cost and it is clear that the sale by B & O of the 300,-000 Reading shares was for the purpose of using in a consolidated tax return the B & O capital loss as a partial setoff against the C & O capital gain. On the other hand, there was an understanding between B & O and C & O that if use of this setoff should cause the tax liability of B & O for any year after 1964 to be higher on a consolidated basis than on an unconsolidated basis, in that event C & O would reimburse B & O to the extent of the excess.

The sale of the 300,000 Reading shares at $12 per share was authorized at a meeting of the directors of B & O; there were nine directors at the meeting, of whom six had no connection whatever with C & O (including the President of Johns Hopkins University and two of the leading bankers in Baltimore).

Payment of $750,000 was made by Otis & Co. on September 21, 1964, and the balance of the purchase price was payable in installments over three years. Otis & Co. and C & O made an agreement at the time of the sale by B & O of the 300,000 Reading shares. Under this agreement, Otis & Co. could put the shares to C & O at any time between September 1, 1965 and September 21, 1967 at the same $12 per share; if Otis & Co. wished to sell the shares within three years C & O had a right of first refusal.

The sale by B & O of the 300,000 Reading shares on September 21, 1964 resulted in a long term capital loss to B & O of $27,173,853.

In a consolidated tax return filed by B & O and C & O for the calendar year 1964, B & O's capital loss of $27,173,853 was used to offset substantially the capital gains of C & O, such as the forty-nine million dollar capital gain on sale of the Toledo pier facilities.

The theory of the primary cause of action was that the sale of the Reading shares was caused by C & O for the tax benefit of C & O, that the price to B & O was inadequate, that the benefit to C & O of the tax saving (said for plaintiffs at the hearing to have been about five million dollars) should have been shared with B & O, and that the sale of the Reading shares was in substance to C & O and was in violation of the Clayton Act. The theory of the additional cause of action was that transactions between C & O and B & O were unfair to the latter and having been made without competitive bidding were in violation of Section 10 of the Clayton Act (15 U.S.C. § 20).

It is not claimed in any of the complaints that any officer or director of C & O or B & O received any personal benefit from any of the transactions questioned.

The jurisdiction of this Court over the four actions is based on diversity of citizenship.

By order filed January 11, 1965, Judge Ryan consolidated the four actions (Fed.R.Civ.P. 42(a)) and designated General Counsel for all plaintiffs.

The agreement of compromise, contained in a stipulation of settlement dated May 8, 1967, provides that C & O will pay to B & O one million dollars in full settlement of all claims based on the transactions set out in the complaint.

B & O must pay, out of the million dollars to be received, the fees and expenses (including attorney's fees and accountant's fees) of plaintiffs, as allowed by the Court. It has been stated for plaintiffs that the aggregate of all such fees and expenses, for which application will be made, is $175,000.

The reasons why ICC approved control by C & O of B & O provide background to an understanding of the relationship between the two railroads at the time of the transactions here in question.

B & O was in very bad financial condition. It had in 1961 the largest loss in its long history. Its then current liabilities exceeded its current assets by nearly twenty-five million dollars. It had 86,181 cars, of which 50,000 cars should have been retired; attempting to use this outworn and obsolete equipment caused enormous increases in annual maintenance expense. The right of way and other properties were "in dire need of rehabilitation" (317 I.C.C. at 275). The examiner's report said that "both financially and physically, B & O is in very bad shape, and what is more important, its position is worsening at an alarming rate" (317 I.C.C. at 333).

On the other hand, C & O was a railroad of great financial strength, sufficient in the opinion of ICC to enable it to help B & O materially. C & O agreed that it would merge with B & O as soon as this was practicable. While the Commission recognized that this could not be soon accomplished (and in any event not without further approval of ICC), it felt that if C & O had control of B & O "the best possible assurance of assistance to B & O is C & O's economic self-interest in the transaction and its agreement with B & O to merge as soon as practicable" (317 I.C.C. at 280). The Commission approved of control by C & O of B & O in order to help B & O through coordinated operations and intercompany transactions. C & O proposed to help B & O by a program of coordination, by consolidating stations and terminals, by improving freight yards, by building and repairing cars, by pooling of equipment and the like. It was contemplated by the Commission that consolidated tax returns would be filed when that "was in order" (317 I.C.C. at 335), meaning as soon as C & O had the 80% stock ownership necessary to authorize consolidated returns (26 U.S.C. §§ 1501, 1504).

In determining whether to approve the compromise or not, the Court does not try out the disputed issues. The compromise was agreed to for the purpose of avoiding just that. Judge Ryan, in Glicken v. Bradford, 35 F.R.D. 144, 151 (S.D.N.Y.1964), said:

"* * * the role of the Court is limited to the extent that its business judgment is not to be substituted for that of the parties who worked out the settlement, and * * * the only question before us is whether the settlement, taken as a whole, is so unfair on its face as to preclude judicial approval."

The following other authorities should be noted: Masterson v. Pergament, 203 F.2d 315 (6th Cir.), cert. denied, 346 U.S. 832, 74 S.Ct. 33, 98 L.Ed. 355 (1953); In re Prudence Co., 98 F.2d 559 (2d Cir. 1938), cert. denied sub nom., Stein v. McGrath, 306 U.S. 636, 59 S.Ct. 485, 83 L.Ed. 1037 (1939); In re Riggi Bros. Co., 42 F.2d 174 (2d Cir.), cert. denied sub nom. Wood & Selick, Inc. v. Todd, 282 U.S. 881, 51 S.Ct. 85, 75 L.Ed. 777 (1930); Barnes v. Osofsky, 254 F.

Supp. 721 (S.D.N.Y.1966); Winkelman v. General Motors Corp., 48 F.Supp. 490 (S.D.N.Y.1942).)

If these were actions on a promissory note for several million dollars, the proposed settlement would be unreasonable.

But without attempting to predict the final outcome, even a brief examination of the theories of these actions shows that the plaintiffs would have trouble in establishing them. In this situation the recommendation of the compromise by the experienced counsel for plaintiffs is entitled to great weight.

It was said for plaintiffs that their chief theory was the benefit to C & O from use of the B & O capital loss in the consolidated tax return for 1964. But, as already noted, several years earlier and in the proceedings before the Commission, the filing of such consolidated returns was contemplated. At the same time, the two railroads were to be, and were in fact, run as a coordinated system and whatever benefited C & O increased its ability to help B & O. There was no detriment to B & O at the time from use of its capital loss in the consolidated return and there was the agreement of C & O to reimburse B & O if any such use of its capital loss caused detriment to B & O in future years. The precedents were not wholly encouraging to plaintiffs when the actions were commenced and a discouraging decision came in a short while. While there may have been differences between Western Pac. R.R. Corp. v. Western Pac. R. Co., 197 F.2d 994 (9th Cir. 1951) and these four actions, the decision ran counter to the theory of plaintiffs and although it was the subject of much further litigation (345 U.S. 247, 73 S.Ct. 656, 97 L.Ed. 986; 205 F.2d 374; 206 F.2d 495; 346 U.S. 910, 74 S.Ct. 242, 98 L.Ed. 407; 346 U.S. 940, 74 S.Ct. 376, 98 L.Ed. 428), it was never changed. The 3 to 2 decision of the Appellate Division in Case v. New York Central R.R. Co., 19 A.D.2d 383, 243 N.Y.S.2d 620 (1st Dept.1963) had validity when the four actions at bar were commenced and that decision was favorable to the theory of plaintiffs. But on February 4, 1965, the Court of Appeals unanimously reversed (15 N.Y. 2d 150, 256 N.Y.S.2d 607, 204 N.E.2d 643).

Another theory of plaintiffs was that the price of $12 for the Reading shares was inadequate. After it had been determined, for the reasons already indicated, that the sale should be made, the problem remained of finding a buyer for a price. At the beginning of September 1964, reports were obtained from two leading New York investment banking houses. The market price of Reading shares was then $10\frac{1}{8}$. With the "put" agreement by C & O, one of the investment bankers was of opinion that a discount from market would be necessary to sell the shares, the discount from $10\frac{1}{8}$ being to a 9–$7\frac{1}{2}$ range with the lower range "the more realistic one". The other investment banker was of opinion that, with the "put", the price should be roughly $\frac{1}{2}$ point above market of $10\frac{1}{8}$, or $10\frac{5}{8}$. Both stressed the past losses of Reading (about 5 million in 1962 and about 6.5 million in 1963) and the poor outlook for it and the railroad industry. Some efforts were then made to find a buyer but finally the sale to Otis & Co. was negotiated; it was an essential that C & O agree to the put. Based on the two investment banker reports, it was determined that the price should be market. The sale agreement was executed, and the closing took place, on the morning of Monday, September 21, 1964. The price was the market close—$12—on Friday, September 18. It may be noted that the 300,000 shares sold were more than all the Reading shares traded on the Exchange in 1964 prior to September 21.

Another theory of plaintiffs was that the sale to Otis was in substance a sale to C & O and, without competitive bidding, would violate 15 U.S.C. § 20 because of interlocking B & O–C & O directors. Counsel for plaintiffs assured the Court that, after investigation, he had "found

absolutely no evidence that Otis was anything but an independent third party buyer completely free of the alleged connection between Otis and C & O". A responsible officer of B & O–C & O had testified by deposition taken for plaintiffs that he knew "as a matter of fact, that Mr. Eaton had no connection whatsoever with Otis & Company". There is no evidence offered for objectants to the contrary.

Counsel for objectant Quirke have called my attention to a recent newspaper article describing Daley, head of Otis & Co., as a "close business associate" of Eaton, chairman of C & O. Assuming for present purposes that the description is true, being a "close business associate" of Daley does not necessarily mean that Eaton had any ownership (or other) interest in Otis & Co. They could have been associated in any number of businesses other than Otis & Co. or the reference might be to the interest which at one time Eaton did have in Otis & Co. The evidence is that Eaton had had no interest in Otis & Co. for at least ten years before September 1964. The newspaper article would not justify any further inquiry.

▮ The remaining theory for plaintiffs, found only in Action No. IV, is that there were numerous transactions between B & O and C & O—such as leasing of cars, exchange of cars, sale of cars, agreements to finance, and the like—which were in violation of 15 U.S.C. § 20 because without competitive bidding.

As to the fairness of these intercompany transactions and whether there was any damage to B & O, counsel for plaintiffs assured the Court at the hearing: "I have checked them out in terms of rental and price, and I am here to say to Your Honor that I do not think that B & O was imposed upon in those transactions, nor that C & O received any inordinate profit". Counsel for plaintiffs later said in this same connection: "my good friend and certified accountant * * * did his usual thorough job of nit-picking these transactions and comparing them with practices in the trade, and I must say in fairness we came up with the conclusion that C & O, to put it perhaps by way of understatement, did not impose on its subsidiary B & O". There was no evidence offered for objectant to the contrary.

It would appear, therefore, that if there was a technical violation of 15 U.S.C. § 20, there was no damage to B & O.

That there were many intercompany transactions between B & O and C & O was only natural; the very purpose of ICC approval of control of B & O by C & O was to encourage such transactions in aid of B & O, relying on the "economic self-interest" of C & O and its agreement eventually to merge with B & O.

▮▮ Under the circumstances, with Commission approval of control by C & O and encouragement to do the very things toward which this theory is directed, it is difficult to see how there could be even a technical violation of 15 U.S.C. § 20. The making of any agreement approved by the Commission and the "carrying out of such agreement" are given immunity from the antitrust laws. 49 U.S.C. § 5b(9).

According to evidence submitted by C & O, as of January 15, 1965, it had invested in equipment for B & O, or had arranged financing for equipment for B & O, to the extent of $194,500,000. This is of course separate from its investment in stocks and bonds of B & O, which at that time stood at $117,700,000.

The discussion above deals with all the points made for objectants at the hearing. Counsel for Quirke afterwards submitted a careful memorandum, most of the points of which have already been considered. It is pointed out for Quirke, on the question of inadequacy of the $12 price, that B & O itself bought in 1963 Reading shares for $15 each and that after September 21, 1964 Reading shares

rose on the market to 15½ within three days and to 21¼ by April 1, 1965.

As to the 1963 purchases of Reading shares by B & O, this seems to have been motivated by fear of New York Central Railroad Company (Central) which owned about 11% of the Reading shares outstanding. For a long time B & O had had "working control" of Reading through ownership of about 42% of the Reading shares. The 1963 purchases increased this to about 49%, reacting to the fact that in 1963 Central began showing more interest in Reading; on May 28, 1963 the President of New York Central became a director of Reading. By the middle of August 1964 the interest of Central in Reading had apparently evaporated—doubtless because of the merger proceedings of Central and Pennsylvania Railroad Company—and by October 1964, at latest, the President of Central had ceased to be a director of Reading. Indeed on September 15, 1964, Central offered to sell all its Reading shares to C & O.

As for higher prices on the market after the September 21, 1964 sale, it must still be remembered that the Reading shares sold by B & O were very high cost shares which appear to have been wisely sold, even if it were desirable to replace them later with lower cost shares. Moreover, it goes without saying that hindsight as to market movements is no test of the merit of a stock transaction. (It may be noted that Reading shares in 1967 have sold between 25¾ and 13.)

In closing, it should be noted that nothing was shown for objectants to indicate that there was any fraud in the transactions in suit or in the negotiations for the compromise proposed.

The decision is that the compromise ought to be, and is hereby approved. If and when this order becomes final, applications for allowances for fees and expenses for plaintiffs may be submitted.

So ordered.