**Edward F. QUIRKE, Plaintiff,**

v.

**CHESSIE CORP. et al., Defendants.**

**No. 72 Civ. 3627.**

United States District Court,
S. D. New York.

Jan. 7, 1974.

Charles Trynin, New York City, for plaintiff.

Donovan, Leisure, Newton & Irvine, New York City, for C. & O. RR and others by Louis C. Lustenberger, New York City, of counsel.

Alexander & Green, New York City, for B. & O. RR by Kenneth Daly, New York City, of counsel.

Kaplan, Kilsheimer & Foley, New York City, for Mercantile-Safe Deposit and Trust Co. by Robert N. Kaplan, New York City, of counsel.

GURFEIN, District Judge.

Plaintiff Quirke and the defendants jointly moved pursuant to Rule 23 and 23.1 for confirmation of a stipulation of settlement. The court ordered a hearing to be held November 29, 1973 with appropriate notice to all Baltimore & Ohio Railroad Company ("B&O") shareholders as a class. The hearing has been held. Objections raised will be discussed below.[1]

Plaintiff is a shareholder of the B&O. Defendant Chesapeake & Ohio Railway Company ("C&O") with a wholly-owned subsidiary owns 94.35 percent of B&O's outstanding common stock and 92.35 percent of the outstanding preferred stock. Other defendants are two wholly-owned subsidiaries of C&O, a bank, Mercantile

Safe Deposit & Trust Co. of Maryland ("Mercantile") and certain officers and directors of one or more corporate defendants.

The complaint, filed on August 24, 1972, alleges in Count I as a class action on behalf of all minority shareholders of B&O (common and preferred) that the defendants have pursued a plan to depress the market price of B&O stock in breach of Section 10(b) of the Securities and Exchange Act of 1934 and Rule 10b–5 and of common law fiduciary duty.[2] As part of the plan it is alleged that C&O caused B&O not to pay dividends on B&O stock, misused B&O's assets for its own benefit, and failed to merge with B&O pursuant to an "agreement" of which the B&O shareholders were third party beneficiaries.

Count II, brought derivatively on behalf of B&O, alleges that certain intercompany transactions were in violation of Section 10 of the Clayton Act (15 U.S.C. § 20) because of interlocking directors and the lack of competitive bidding.

Count III, brought derivatively on behalf of, B&O alleges that B&O entered into equipment trusts and conditional sale agreements with Mercantile, which had two common directors with B&O and that since these dealings were undertaken without competitive bidding, they violated the Clayton Act § 10.

Before we describe the prayers for relief, we must review the history that led to the complaint.

The action is an outgrowth of C&O's acquisition of control of B&O over ten years ago. The Interstate Commerce Commission ("I.C.C."), by order dated December 7, 1962, authorized C&O to acquire a controlling block of B&O stock at a fixed ratio of exchange. The I.C.C. order was entered after extensive hearings. Its opinion is reported as Chesapeake & Ohio Control Baltimore & Ohio,

---

1. At the hearing, the objectors were heard fully on the issue of counsel fees as well as the merits. I did not follow the Third Circuit view on an evidentiary hearing on counsel fees. See Lindy Bros. Builders, Inc. v.

American Radiator & Standard Sanitary Corp., 487 F.2d 161 (3 Cir., 1973).

2. There is also a derivative action on behalf of B&O in this count.

317 I.C.C. 261 (1962); Brotherhood of Maintenance of Way Employees v. United States, 221 F.Supp. 19 (E.D.Mich. 1963), aff'd, 375 U.S. 216, 84 S.Ct. 341, 11 L.Ed.2d 270 (1963).

In 1960, the C&O had made an offer to B&O's shareholders to exchange C&O stock for B&O stock at the ratio of one share of C&O common for one share of B&O preferred; and one share of C&O common for 1.75 shares of B&O common. This offer was amended to include a payment of $1.69 per B&O common share exchanged to compensate for the balance of the 1960 common dividend which had been omitted by B&O. (B&O preferred stock had been paid their full $4.00 per share dividend in 1960, and there was nothing to add.) It was this offer and the subsequent acquisition of control by C&O that was approved by the I.C.C. By 1964, C&O held about 90% of the B&O common and preferred. From 1964 to 1972, C&O increased its holdings of B&O stock by about 5% (to 95%) by purchases.

The plaintiff here, and the, class, are the B&O shareholders, common and preferred, who did not accept the C&O offer of exchange, but elected to keep their B&O stock.

For more than 10 years, the B&O minority received no dividends and found their stock delisted with only a thin market. C&O took charge of the affairs of the B&O, sold and leased it equipment, but never actually merged the two companies, as C&O had allegedly promised the Maryland Port Authority before the I.C.C. "control" decision. Although the minority had refused the exchange offer, they were unhappy at the turn of events—no dividends and no merger.

Almost inevitably a shareholder of B&O arose to champion the cause of the locked-in minority. Four derivative actions were brought in this Court on behalf of B&O and against C&O. One of them also named directors of both railroad companies. See Schleiff v. Chesapeake & Ohio Ry. Co., 43 F.R.D. 175 (S. D.N.Y.1967). The actions involved alleged a breach of fiduciary duty in the sale of certain B&O assets which does not concern us here. In one of the actions (Schleiff v. Biggers, Action IV), there was an added complaint that various transactions between B&O and C&O violated Section 10 of the Clayton Act, because there was no competitive bidding. These involved "leasing of cars, exchange of cars, sale of cars, agreements to finance, and the like," see 43 F.R.D. at 180. Judge Wyatt approved a settlement of all the claims. The most serious objections to the settlement were made by Edward F. Quirke, now our plaintiff in this action.

His present complaint seeks the following relief. In Count I, aside from the injunctive relief sought which would be rendered moot by the settlement, plaintiff asks the Court to compel C&O to pay dividends to the class on their B&O common stock for the period from 1961; to offer C&O stock to the class at the same ratio as was contained in the 1960 exchange offer; and to merge with B&O. He also seeks punitive damages for B&O and the class, as well as an accounting.

In Count II and in Count III, plaintiff seeks treble damages for B&O for the acts allegedly in violation of the Clayton Act.

The defendants have answered the complaint, denied all the material allegations and have pleaded affirmative defenses: that the transactions complained of were authorized by the I.C.C. and that the actions are barred; and that claims as to intercompany equipment transactions occurring before 1968 are barred by res judicata or collateral estoppel as a result of the Schleiff case, supra. They also plead, in varying degrees, the defenses of the statute of limitations, laches, waiver and estoppel.

I have determined that a proper class exists under Fed.R.Civ.P. 23(a) and 23(b)(3).

There has been extensive document discovery as well as discovery by interrogatories. There is enough before me

now to permit a consideration of the adequacy of the settlement.

 The settlement provides, essentially, that C&O will reopen its 1960 exchange offer to B&O shareholders and will exchange one share of stock for each share of B&O preferred stock and one share of stock for each 1.75 shares of B&O common stock. In addition, C&O will pay cash in the amount of $1.-69 for each B&O common share exchanged before the settlement date. Late exchangers of B&O common stock will still receive the offered stock, but without the cash payment. All who did not opt out are deemed to have accepted the settlement as members of the class.

Since there has been a reorganization of C&O, which became a wholly-owned subsidiary of Chessie System, Inc. ("Chessie") on a share-for-share basis, it is the Chessie stock that will be exchanged. It is traded on the New York Stock Exchange, while C&O stock is no longer traded on any exchange. The parties have obtained a "no action" letter from the SEC permitting the B&O shareholders to sell their acquired Chessie stock without registration.

On review of the claims and defenses, I find it hard to believe that carrying this lawsuit to the end would benefit the class.

The attempt to force the payment of dividends, while not impossible of achievement, is most unpromising. There is little authority that a court may order the payment of dividends, and these scattered cases all seem to concern close corporations. To compel a public corporation to declare dividends would require the Court not only to find that the passing of dividends was, in essence, a manipulative device to coerce the minority, but also that there were earnings to support the dividends, and that the restrictions of various loan agreements did not inhibit their payment. The difficulty is even greater because there is a provision in B&O's Supplemental Indenture of March 13, 1946 for Convertible Income Bonds that

"Available Income" for any year includes a carry-forward of any deficit in "Available Income" for preceding years. We know that in 1961, B&O suffered a net loss of $31.3 million, and that when C&O took control of B&O in 1962, B&O "[was] in very bad shape, and what is more important, its position [was] worsening at an alarming rate." *Schleiff, supra,* 43 F.R.D. at 178 (quoting the examiner's report to the I.C.C. from the I.C.C.'s "Control Decision," 317 I.C.C. at 333).

 The attempt to compel a merger is also beset with difficulty. The claim is based on an agreement between B&O and the Maryland Port Authority that a merger between B&O and C&O would be consummated within a reasonable time. The plaintiffs would have to establish that they were intended to be third party beneficiaries, rather than incidental beneficiaries to ground an action in contract. See German Alliance Ins. Co. v. Home Water Supply Co., 226 U.S. 220, 33 S.Ct. 32, 57 L.Ed. 195 (1912), Restatement of Contracts § 147 (1932). And they would have to establish that the "agreement" was, in the absence of terms for the merger, something more than a mere agreement to agree. V'Soske v. Barwick, 404 F.2d 495 (2 Cir.), cert. denied, 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1968). Finally, it is doubtful that a court could compel a merger in view of the primacy of the I.C.C. which, in the public interest, could insist on no merger unless other conditions were added.

 The claim that the alleged misuse of B&O's assets was part of an alleged scheme to depress the market price of B&O stock is more litigable. The plaintiffs face obvious difficulties, however. Was there a purchase and sale under the doctrine of Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2 Cir. 1951), cert. denied, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952), and its progeny? If he leaped that hurdle (cf. Superintendent of Insurance of N.Y. v. Bankers Life & Cas. Co., 404 U.S. 6, 92

S.Ct. 165, 30 L.Ed.2d 128 (1971)), there would be another hurdle. When railroads come into common control for their mutual benefit, the burden of proof on breach of fiduciary duty does not shift to the defendant, but remains with the controlled railroad. Ewen v. Peoria & E. Ry. Co., 78 F.Supp. 312 (S. D.N.Y.1948, Learned Hand, J.) cert. denied sub nom., Income Bondholders of the Peoria & E. Ry. Co. v. N.Y. Central Ry. Co., 336 U.S. 919, 69 S.Ct. 642, 93 L. Ed. 1082 (1949). Here we have the Control Decision of the I.C.C. stamping its approval of control so that B&O had the burden of proof under *Ewen, supra.* The defendants also raise the interesting question of how far Section 5(11) of the Interstate Commerce Act, 49 U.S.C. § 5(11), immunized the transactions.

Section 5(11) reads, in pertinent part:

". . . [A]ny carriers or other corporations . . . participating in a transaction approved or authorized under the provisions of this section shall be and they are relieved from the operation of the antitrust laws and of all other restraints, limitations, and prohibitions of law, Federal, State, or municipal, insofar as may be necessary to enable them to carry into effect the transaction so approved. . . ."

Analogy is offered to the exclusion of federal court jurisdiction under the Federal Aviation Act because of the primary jurisdiction of the C.A.B. See Hughes Tool Co. v. Trans World Airlines, 409 U.S. 363, 93 S.Ct. 647, 34 L. Ed.2d 577 (1973). Happily, this Court need not decide the question. I can decide, however, that it raises a question not without difficulty for the plaintiffs.

With respect to Counts II and III, the derivative recoveries for B&O would, in any event, presumably not be distributable to the class. See Gordon v. Fundamental Investors, Inc., 362 F.Supp. 41 (S.D.N.Y.1973). The *Schleiff* case poses, in addition, a problem of *res judica-* *ta* or collateral estoppel with respect to transactions prior to March, 1968; and discovery has established that the type of challenged transactions were small in size and few in number after that date.

Three objectors appeared at the hearing. When each expressed dissatisfaction with the settlement, I gave each permission to opt out, even though the time to opt out specified in the notice had passed.

Their objections are primarily to the failure of the settlement to get them back dividends for the more than ten years that had elapsed since they chose not to accept the C&O offer of 1960. They also object to the legal fees and contend these should be paid by the defendants. One objector contends that the preferred shares should also get a cash payment of $1.69 as the common does. One also contends that the provision for legal fees falls unfairly on the common shares to the advantage of the preferred.

I am afraid that their reach exceeds their grasp. There is no reasonable assurance that they could get these back dividends by judgment, or force a merger by decree. The $1.69 cash payment to the common shareholders is rationalized as an equivalence for the $1.69 paid to each common share in the original 1960 exchange offer. But it is no more than a rationalization of a desire to restore those respective shareholders to their position at the time of the original offer. The preferred shares had received no such cash payment in the original exchange offer.

The value of the settlement is, for the common shares, the value of the Chessie shares plus $1.69 per share, less the value of the B&O stock which the class will surrender in exchange. The value of the settlement for the preferred shares is the value of the Chessie shares less the B&O preferred stock surrendered.

Since we are dealing with volatile securities, the ratio of market price to market price may fluctuate because of

extraneous considerations. I think it fair to freeze the ratio at the settlement date to measure the benefits conferred.

The settlement agreement was signed on September 25, 1973, and a press release announcing its terms was released that day. On September 21, 1973, seventeen B&O shares were traded at $13, and on September 26, 1973, twenty shares traded at $13⅛. On September 21, the preferred traded at $24.[3]

By virtue of opt-outs, the class has been reduced to the holders of 36,126 B&O preferred shares, and 127,372 common shares, and the Settlement Fund consists of 108,910 Chessie common shares and $243,000 in cash.[4] C&O will distribute 108,910 Chessie shares with a market value on the date of settlement of $4,723,969, plus cash payments totaling $243,000. The market value of the tendered shares, as of the settlement date, was $2,522,860. Thus, the benefit conferred on the class as a whole is $2,444,109.

 Charles Trynin, Esq., the plaintiff's attorney, asks a fee of $675,000. If we take the net benefit to the class to be $2,444.109, the requested fee of $675,000 is about 27.5% thereof. That is within a historical range of fee award. We are being increasingly admonished by the appellate courts, however, to look more to the time sheets, perhaps, than to the benefits conferred. The standards are generally set forth in Alpine Pharmacy, Inc. v. Chas. Pfizer & Co. Inc., 481 F.2d 1045 (2 Cir. 1973). I have a high regard for Mr. Trynin as an experienced and able attorney in securities cases involving both derivative and class actions, and I must take that into account. I must also consider that he did quite a job of persuasion in getting the able counsel for the defendants to agree to so favorable a settlement. On the other hand, the time spent alone can-

not equate to anywhere near his requested fee.

I accept Mr. Trynin's affidavit of November 16, 1973 in which he estimates that he spent 1989.25 hours on the matter. There is no doubt that his arrangement with Mr. Quirke was that his fee was to be wholly contingent and was to come only from assets recovered. If I considered $150 an hour a fair fee on a contingency basis, I come to about $300,000. If I heed the admonitions to consider time spent as a factor, I feel the most I should do is to reduce the percentage recovery to somewhere around 18%, the lower end of the range. This comes to $440,000.

I think the plan proposed for payment of the fee is fair. The common shareholder is getting a larger benefit per share than is the preferred.

The settlement provides that the fee is to be payable first out of the cash payment fund, which should amount to about $243,000. The balance would be paid by giving Mr. Trynin the equivalent of shares of Chessie stock, deducted from the class members proportionately. He will be owed about $197,000 of the awarded fee. Each class member's stock contribution to counsel fees is to be equal to the proportion which the number of whole Chessie shares to be received by him bears to the total number of Chessie shares to be distributed. The exchange agent is to sell a sufficient number of a class member's shares to pay his contribution, remitting to him any cash balance from the sale. The number of shares likely to be sold for payment of the fee is not enough to affect the market adversely. Volume in Chessie common seems to have been running 10,000 shares per day.

It is significant that the objectors wanted assurance from the Court that if they wish to opt in again before the

---

3. The arbitrageurs apparently figured the settlement was worth something more than $10 per common share, because within the month after the settlement was announced, the price went from 13 to 23. The preferred went from 24 to 34 on November 5.

4. The three objectors who were given permission to opt out at the hearing, but who may not do so hold an aggregate of 5900 common shares and 900 preferred.

closing date, they will be permitted to do so. The only reason to opt out is either to bring a new lawsuit, which none of the objectors has done in the decade past, or to speculate that one day B&O and C&O will have to merge, regardless of lawsuits. Whether such a merger would actually give the B&O minority more is speculative at best.

Chessie agreed at the hearing that it will pay the transfer tax and other charges in the exchange.